605 A.2d 799
COMMONWEALTH of Pennsylvania, Appellee,

v.

Leigh Beth STUBBLEFIELD, Appellant.

Superior Court of Pennsylvania.

Argued Sept. 11, 1991.

Filed Feb. 10, 1992.

Reargument Denied April 16, 1992.

430

Sally Frick, Pittsburgh, for appellant.

Kemal A. Mericli, Asst. Dist. Atty., Pittsburgh, for Com., appellee.

Before WIEAND, CIRILLO and MONTGOMERY, JJ.

CIRILLO, Judge:

Leigh Beth Stubblefield appeals from a judgment of sentence entered in the Court of Common Pleas of Allegheny County. We affirm.

Leigh Beth Stubblefield was arrested and charged with violating the Controlled Substance, Drug, Device and Cosmetic Act: Possession with Intent to Deliver (cocaine)[1] at Count I and Criminal Conspiracy[2] at Count II. Following the denial of an omnibus pretrial motion, which included a motion to suppress evidence, Stubblefield was tried before the Honorable Jeffrey A. Manning and convicted of possession of cocaine with intent to deliver.[3] Post-trial motions were filed and denied, and Stubblefield was sentenced to a term of incarceration of not less than four years nor more than eight years, and to pay a fine of $25,000.[4] This timely appeal followed.

On February 10, 1989 Agent Lawrence R. Shoup of the Pennsylvania Attorney General's Bureau of Narcotics Investigation, and Detectives Dean Kaminski and James Hasara of the Allegheny County Police were working at Pittsburgh International Airport as part of a drug interdiction team. As the three detectives were observing travelers disembarking from a flight from Philadelphia, they noticed a black male, later identified as Bruce Harvin, exit the

---

1. 35 Pa.S. § 780–113(a)(30).

2. 18 Pa.C.S. 903(a)(1).

3. The trial court sustained Defendant's demurrer to the charge of criminal conspiracy.

4. The fine was imposed pursuant to 18 Pa.C.S. § 7508.

plane. Agent Shoup testified that the only thing unusual about Harvin at that point was that he was wearing dark sunglasses inside the airport on an overcast day. A black female, later identified as Stubblefield, exited the plane behind him. Stubblefield was walking behind Harvin at a distance of approximately 15 to 20 feet. As the detectives watched all the passengers walk through the corridor, Agent Shoup heard Harvin call out to Stubblefield. Stubblefield had turned into a dead end corridor and Harvin, who was walking ahead, stopped, turned, and said, "Miss, Miss, I think it's up this way." Stubblefield did not verbally respond, but again started following Harvin at a distance of approximately 10 to 15 feet.

At this point Agent Shoup decided that something was strange in the manner in which Stubblefield and Harvin were conducting themselves and he mentioned his observation to Detectives Kaminski and Hasara. The detectives agreed, and the three of them began following Harvin and Stubblefield for further observation. Shortly ahead the corridor divided. Harvin stopped and Stubblefield caught up to him. They talked briefly. Then Harvin went into the men's restroom and Stubblefield began walking towards the exit. Detective Hasara remained to continue surveillance of Harvin while Agent Shoup and Detective Kaminski followed Stubblefield past an airport security checkpoint.

Immediately past the security checkpoint Agent Shoup and Detective Kaminski approached Stubblefield, identified themselves and asked to speak with her. She agreed. Agent Shoup asked about her flight itinerary and Stubblefield responded that the flight had arrived from Florida with a connection in Philadelphia. However, when asked, Stubblefield could not recall the name of the city she had visited in Florida. Although she had arrived in Florida on February 9, the previous day, ostensibly to visit her boyfriend, Bruce, Stubblefield did not know her boyfriend's last name. She did admit that he was the man who called her "Miss" in the airport corridor and had later stopped to talk with her. When asked if she had her airline ticket, without

even checking her purse or pockets, Stubblefield immediately stated that she had lost it. In response to Agent Shoup's inquiries about her luggage she said that she had also lost that. Agent Shoup next suggested that they move to the vacant British Airways counter nearby which was away from the pedestrian traffic. Stubblefield followed Agent Shoup over to the counter.

At the ticket counter Shoup asked Stubblefield for identification. She produced a voter's registration card, a welfare card and a Pennsylvania driver's learner's permit—all of which identified her as Leigh Beth Stubblefield. Agent Shoup returned the identification to her and asked her to sign a consent-to-search form. He showed her the form which he carried as part of his work on the drug interdiction team. Stubblefield looked over the form and answered "Well, if I don't have to, I'd rather not." Agent Shoup testified that he responded "Okay. You don't have to. That's right." Stubblefield then told Shoup that she wanted to locate her luggage and her boyfriend, Bruce. Shoup informed her that the baggage claim was located downstairs and added, "If you want, we could walk down that way." Stubblefield did not object. The two of them made their way to the baggage claim area where the following exchange took place:

Stubblefield: Well, I have to go to the bathroom.

Shoup: Oh, you do.

Stubblefield: Yeah. Do you have a lady or someone to go in there with me?

Shoup: Okay. We can do that.

Agent Shoup enlisted the aid of two female security officers who accompanied Stubblefield into the restroom. Later, in the corridor, one of the security officers, Pat Remaley, told Agent Shoup that as Stubblefield was using the restroom facilities, it appeared as if she was trying to conceal something on her person. Upon hearing this Agent Shoup approached Stubblefield, who was with Detective Kaminski, and requested that she accompany him to the police office in the airport. Stubblefield agreed. In the

police office Agent Shoup asked Stubblefield for permission to allow a female security officer to conduct a search of her person and her baggage. Stubblefield refused. Shoup requested that she wait while he typed a search warrant to present before a district justice. Stubblefield agreed and Shoup permitted her to make some phone calls while she waited. Shoup testified that he never indicated to Stubblefield that she was not free to leave at any time.

Detective Kaminski, who had left the office to locate Detective Hasara, returned and informed Shoup that Detective Hasara had questioned Harvin. Harvin had denied traveling with Stubblefield. Stubblefield indicated that she wanted to speak privately with Agent Shoup. Agent Shoup told her that Police Officer Justine Start, who had replaced the female security officers, would have to remain. Stubblefield responded, "I think I got what you want." Shoup immediately read her the *Miranda* [5] warnings. Then Shoup asked Stubblefield what she was talking about, but she did not elaborate. Instead, Stubblefield indicated that Shoup did not have to go through with the search warrant. He told her he would finish typing the warrant and they would let a district justice determine whether she should be searched. As Agent Shoup was completing the paperwork, Stubblefield again indicated that Shoup did not need to obtain a search warrant. She also repeated, "I think I got what you want." Agent Shoup declined to perform a consent search at that time. Later, when Agent Shoup had completed the warrant, he stepped out of the office to confer with the detectives. As he looked back into the office he saw Stubblefield hand a package wrapped in brown paper to Officer Start. The package was later determined to contain approximately a kilo of cocaine. Officer Start told Agent Shoup that Stubblefield had removed the package from a girdle under her sweater. Stubblefield was immediately placed under arrest and was again given

---

**5.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

the *Miranda* warnings. She was also given a waiver of rights card which she signed.

■ On appeal Stubblefield presents two issues for our review:

(1) Was the Appellant illegally detained and seized by the officers during an airport stop without sufficient information to support a finding of reasonable suspicion or probable cause to arrest.

(2) The Pennsylvania Constitution requires that investigating agents advise individuals who are the subject of airport investigatory stops/detentions that those persons have the right to refuse to speak or to consent to a search and/or to accompany the agents.

Regarding our standard of review, the Supreme Court of Pennsylvania in *Commonwealth v. Cortez,* 507 Pa. 529, 491 A.2d 111 (1985), *cert. denied,* 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985), stated:

When we review the ruling of a suppression court we must determine whether the factual findings are supported by the record. When it is a defendant who has appealed, we must consider only the evidence of the prosecution and so much of the evidence of the defense as, fairly read in the context of the record as a whole, remains uncontradicted. Assuming that there is support in the record, we are bound by the facts as are found and *we may reverse the suppression court only if the legal conclusions drawn from those facts are in error.*

507 Pa. at 532, 491 A.2d at 112 (emphasis added). The determination of whether probable cause or reasonable suspicion of criminal activity exists is a legal conclusion to be drawn from the facts as found by the suppression court. *See Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

■ The Fourth Amendment to the United States Constitution and Article 1, § 8 of the Pennsylvania Constitution guarantee the right of individuals to be protected from unlawful governmental searches and seizures. The United

States Supreme Court in *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), quoting *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), explained that not all interactions between the police and citizens involve seizures of persons. Only when the police have restrained the liberty of a person by a show of authority or physical force may we conclude that a seizure has occurred. 486 U.S. at 573, 108 S.Ct. at 1979. An evaluation as to whether a seizure has occurred must be viewed in light of all the circumstances and whether a reasonable person in those circumstances would have believed he or she was free to leave. 486 U.S. at 572, 108 S.Ct. at 1978.

■ A close reading of the record establishes that Stubblefield was not illegally detained and, as such, there was no seizure of her person in the present case. The police identified themselves and requested to speak to Stubblefield in the airport corridor, a public place. She voluntarily answered their questions. There is no evidence that she was restrained by either a show of authority or physical force. Thus, there was no seizure of her person during the preliminary encounter. *See Commonwealth v. Lidge*, 399 Pa.Super. 360, 582 A.2d 383 (1990).

In *Commonwealth v. Douglass*, 372 Pa.Super. 227, 539 A.2d 412 (1986), *allocatur denied*, 520 Pa. 595, 552 A.2d 250 (1988), this court described the circumstances under which an individual is required to respond to questions posed by police.

A police encounter with a suspect may be properly characterized as a mere encounter, an investigative detention, a custodial detention, or a formal arrest. A "mere encounter" (or request for information) need not be supported by any level of suspicion, but it carries no official compulsion to stop or respond. An "investigative detention" must be supported by reasonable suspicion; it subjects the suspect to a stop and a period of detention, but

does not involve such coercive conditions as to constitute the functional equivalent of arrest. (citations omitted). 372 Pa.Super. at 238–39, 539 A.2d at 417–18.

■ When Agent Shoup approached Stubblefield and inquired about her flight in a conversational tone it was a mere encounter. Agent Shoup was requesting information and Stubblefield was under no obligation to stop or respond. *Id.* The incident with the police at the airport began as a mere encounter and evolved into an investigative detention based upon the detectives' reasonable suspicions of criminal activity. *Id.* During the initial encounter between the police and Stubblefield the police were not required to possess a reasonable suspicion that Stubblefield had committed a crime in order to question her. *Id.* "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual ... in [a] public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen ..." *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983). During the consensual questioning of Stubblefield in the airport corridor the police became reasonably suspicious of criminal activity as the result of her responses. When Agent Shoup directed Stubblefield over to the ticket counter for further questioning as a result of his reasonable suspicions the mere encounter developed into an investigative stop or detention. *Douglass, supra.*

In order to evaluate the validity of an investigative stop or detention we must first determine whether the law enforcement officials' actions were justified from the beginning. To be justified the officials must have had reasonable suspicion that a crime had been, or was about to be, committed. "Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors— quantity and quality—are considered in the 'totality of the circumstances—the whole picture,' that must be taken into account when evaluating whether there is reasonable suspi-

cion." (citations omitted). *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301, 309 (1990).[6]

Agent Shoup has been in narcotics investigations for approximately seven years. Through his professional experience as a member of the drug interdiction team he has become familiar with certain patterns of behavior often associated with illicit drug activity. Shoup learned upon questioning Stubblefield that she had lost both her airline ticket and her luggage, that she was unaware of her location while in Florida, and that she did not know her boyfriend and traveling companion's last name. In addition, it appeared to the members of the drug interdiction team that Harvin and Stubblefield were attempting to conceal the fact that they were traveling together. Finally, Stubblefield's brief stay in Florida, a source city, is consistent with the drug courier profile.[7] When questioned, Stub-

6. This court considered the propriety of an investigatory stop of an individual on the driveway of his private residence in *Commonwealth v. Ogborne*, 384 Pa.Super. 604, 559 A.2d 931 (1989) (Tamilia, J., dissenting), *reargument denied,* July 10, 1989. Although our supreme court initially granted allocatur, *Commonwealth v. Ogborne*, 524 Pa. 626, 574 A.2d 68 (1990), the appeal was later dismissed as improvidently granted, *Commonwealth v. Ogborne*, 525 Pa. 570, 583 A.2d 789 (1991). The United States Supreme Court granted certiorari, vacated judgment, and remanded to our court for further consideration in light of *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). The panel (Cavanaugh, Tamilia and Popovich, JJ.) filed its revised opinion on October 21, 1991, affirming the judgment of sentence (Popovich, J. dissenting).

In *Ogborne*, based on a tip from a reliable informant, the police conducted an investigatory stop of an individual in his private driveway. The appellant was known to the police to deal in drugs, and the informant described the car appellant would be driving, his destination, his approximate time of arrival and the type and approximate quantity of drugs he would be carrying. In short, the informant, whose veracity was known to the police, detailed future activity not generally known to the public, as required by *Alabama v. White, supra. This court found the totality of circumstances in Ogborne, which provided the officers with reasonable suspicion to conduct the investigatory stop, to be similar to those in White, and affirmed the conviction on that basis.*

7. The drug courier profile, developed by Drug Enforcement Administrator Special Agent Paul Markonni, is used to determine whether a particular traveler shows traits or characteristics common to drug traffickers. The profile traits can in certain circumstances be used to

blefield admitted that Harvin was her boyfriend and that they were traveling together from Florida. It was the totality of these circumstances during the mere encounter between the police and Stubblefield that caused the police to grow reasonably suspicious of criminal activity, warranting an investigative detention which resulted in Stubblefield admitting to possession of a package of cocaine on her person. *Douglass, supra.* The factual findings are supported by the record, and the suppression court's conclusion that Stubblefield was not illegally detained was proper. *Cortez, supra.*

■ Stubblefield next argues that the Pennsylvania Constitution requires law enforcement officials to affirmatively advise any suspect who is the subject of an airport investigatory stop or detention that he or she is not required to cooperate and may refuse to speak with them. She further argues that officials who fail to do so, such as Agent Shoup, risk having the incident viewed as an illegal detention. This contention has no merit. Stubblefield's initial encounter with the police was a mere encounter, *Douglass, supra,* and did not require the police to inform her that she did not have to cooperate. The record reveals that Agent Shoup and the detectives never indicated in any manner that Stubblefield was not free to terminate the questioning and vacate the area.

Moreover, when the mere encounter yielded sufficient reasonable suspicion to justify an investigative stop, Agent Shoup promptly requested that Stubblefield sign a consent to search form, but she stated that she really did not want to sign it. Agent Shoup also informed Stubblefield that she did not have to sign the consent to search form. We reiterate what this court stated in an earlier decision:

> ... it must be recognized that the *Commonwealth need not demonstrate that the consenter was aware of his right to refuse consent* [to a search].

support a finding of reasonable suspicion. *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

*Commonwealth v. Woods,* 240 Pa.Super. 72, 76, 368 A.2d 304 (1976) (emphasis added).

We conclude, therefore, in light of the foregoing that Stubblefield was not illegally detained and that the police were under no obligation to affirmatively inform her that she had a right not to cooperate.

We affirm the judgment of sentence.

MONTGOMERY, J., files a dissenting statement.

MONTGOMERY, Judge, dissenting:

I must respectfully dissent. In my view, the police did not have a reasonable suspicion of criminal activity and their actions constituted a seizure, rather than a mere encounter.

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court held that police officers may detain a person to investigate suspicious circumstances on less than probable cause. In order to do so, however, the officer must observe unusual and suspicious conduct which leads the officer to reasonably believe that criminal activity is afoot. *Id.*

On the facts presented to the trial court, I cannot conclude that there is any unusual and suspicious conduct present here which would justify a *Terry* stop. In *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), the Georgia Court of Appeals reversed a suppression order, holding that the DEA agent's stop of Reid was valid because: (1) Reid had arrived from Fort Lauderdale, which the agent testified was a source city for cocaine; (2) Reid arrived in the early morning, when law enforcement activity is diminished; (3) Reid and his companion appeared to the agent to be trying to conceal the fact that they were traveling together; and (4) Reid had no luggage other than a shoulder bag. The Supreme Court, in reversing, concluded that *as a matter of law* the agent could not have reasonably suspected criminal activity on these circumstances. The Court found that nearly all the circumstances

relied on by the lower court "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures" if the Court were to find the stop valid. *Id.* at 441, 100 S.Ct. at 2754. I believe the same is true in the present case.

Furthermore, I cannot agree that the actions of the police established only a "mere encounter" rather than a "seizure." In Fourth Amendment terms, even a brief detention short of traditional arrest constitutes a seizure of the person and must be reasonable. *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). *Terry* defines a seizure as a police officer accosting an individual and restraining that individual's freedom to walk away. The restraint need not be by physical force but may also be by show of authority, for example the threatening presence of several officers or the use of language or tone of voice indicating that compliance with the officer's request is required. *Id.; United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). The question is whether, in view of all of the surrounding circumstances, a reasonable person would have believed that he was not free to leave. *Id.*

In the instant case, the officers' actions went far beyond the mere encounter described in *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Officers Shoup and Kaminski flanked appellant, one on each side of her, as she walked through the airport, requested identification and information, and refused to leave appellant's side even after she had produced identification and refused the officers' request to consent to a search. Had this been a "mere encounter," appellant's production of identification and her refusal to consent to a search would have terminated the officers' right to proceed further. *Id.* Instead, the officers continued to follow appellant through the airport, one on either side of her, and continued to interrogate her. Whenever appellant sought to leave, the officers simply continued to accompany her. Appellant was not even permitted to use the bathroom in privacy, Officer Shoup having recruited

two female security guards to accompany and observe appellant as she used the toilet. In view of all of these circumstances, I cannot conclude that a reasonable person would have believed he or she was free to leave.

In my view, appellant was "seized" within the meaning of the Fourth Amendment at least as early as when she first refused to consent to a search and the officers did not allow her to continue through the airport unimpeded and unaccompanied. At this time, the officers did not have sufficient specific and articulable facts to support a suspicion of criminal activity. I would, therefore, reverse the order denying suppression, vacate the judgment of sentence and grant appellant a new trial.