630 A.2d 1231

**COMMONWEALTH of Pennsylvania**

v.

**Robert JACKSON, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 11, 1993.

Filed Aug. 2, 1993.

Reargument Denied Oct. 5, 1993.

Mitchell A. Kaufman, Asst. Public Defender, Pittsburgh, for appellant.

Kemal A. Mericli, Asst. Dist. Atty., Pittsburgh, for Com.

Before ROWLEY, Presiding Judge, and DEL SOLE and CERCONE, JJ.

DEL SOLE, Judge:

Robert Jackson appeals from a sentence of four to eight years imprisonment imposed after he was found guilty of possession of a controlled substance, and possession with intent to deliver. He raises one issue for our review, whether the trial court erred in failing to suppress cocaine found in his possession after he was searched by Allegheny County police officers at Greater Pittsburgh International Airport Terminal. He asks us to review on both state and federal constitutional grounds. However, since Appellant failed to raise his state constitutional claims in the trial court, they have been waived. We must therefore analyze Appellant's claim on federal constitutional grounds and leave the discussion of state constitutional protections for another time. For the reasons set forth

below, we vacate the judgment of sentence and remand this case for a new trial.

The evidence established that on November 22, 1989, two plain clothes police officers for the Airport Drug Interdiction team were on duty at Greater Pittsburgh Airport. The officers were stationed there to observe and apprehend potential drug dealers who were either arriving in or departing from the airport, otherwise known as working the "drug courier profile." One of the officers noticed Appellant, a casually-dressed black male in his early twenties, board an airplane destined for Newark, New Jersey. The officer later testified that they focused on Appellant because Newark is a claimed drug-source city, he was the last to board the plane and had no carry-on luggage.

After Appellant boarded the airplane, the officers received information from an airline employee that Mr. Jackson had purchased his ticket that day, had paid for it in cash, and was scheduled to return to Pittsburgh approximately three hours later [1]. The officers intended to observe Appellant and staked out the return flight but he was not on it.

The next day, three officers including those from the day before, observed Appellant debark from an arriving Newark flight at approximately 3:00 PM with a carry-on bag. Appellant was watched as he entered and exited a men's room. While in the men's room, one of the officers observed Appellant's bag being placed on the ground, he heard the sound of a zipper and a flush of the toilet. The officers noticed that as Appellant left the restroom and headed toward the baggage claim area, he glanced about. This the officers characterized as an effort to determine whether he was being followed. Appellant was then approached by the officers.

---

1. A supposed drug courier characteristic is traveling without either carry-on or checked luggage. The officers attempted to determine if Appellant had checked any luggage. They were unable to do so. However, appellant had in fact checked luggage, even though this fact was not evident from the officers' inquiry with the airline employee. The officers assumed that appellant had checked no luggage, and considered this as also indicative of the suspected behavior of being a drug courier.

They identified themselves while walking along side of Appellant and asked if he would mind speaking with them. Appellant agreed, and when asked, provided the officers with his airplane ticket and a photo ID, both in his name. At the officers' request, Appellant stepped out of the flow of traffic and into a hallway near an elevator and a set of stairwells.

Appellant placed his bag on the floor and offered to have it searched even though the officers did not possess a search warrant. They informed Appellant that he did not have to permit a search. While one of the officers looked through the bag, the other asked Appellant if he would mind being patted down; Appellant said he did not mind. The officer reiterated that Appellant did not have to agree to the pat down search, but Appellant told the officer to go ahead.

The pat down resulted in a finding of one baggie of cocaine in Appellant's pocket, and he was then placed under arrest. A further search discovered additional cocaine totalling over 500 grams. Additionally, Appellant was carrying approximately $400.00 in cash.

Although police may have a mere encounter with any individual at any time, when the questioning elevates to the level of an investigatory stop, the inquiring officer must have a reasonable suspicion justifying that stop. *Commonwealth v. Stubblefield,* 413 Pa.Super. 429, 605 A.2d 799, 802 (1992), citing *Commonwealth v. Douglass,* 372 Pa.Super. 227, 539 A.2d 412 (1988), allocatur denied 520 Pa. 595, 552 A.2d 250 (1988). In this case, the officers initially engaged in a mere encounter when they approached appellant, identified themselves, asked to see Appellant's flight information and identification, and advised Appellant that he was not required to comply with their request. However, when the officers maneuvered Appellant out of the line of pedestrian traffic, after determining that his flight information and identification were not in an assumed name, they went beyond the scope of a mere encounter and escalated the confrontation into an investigatory stop. At this point the only articulable suspicion the officers established was that Appellant appeared nervous and his hands were

shaking. This is behavior that any reasonable person might exhibit if confronted by three undercover police officers. (Trial Transcript, September 11, 1990, at 50, testimony of Officer Anthony Olearchick). Therefore, no reasonable suspicion existed that would lead one to believe that crime was afoot. Consequently, although appellant offered to have his bag searched and consented to a pat down, that consent was offered at the point when the mere encounter became an investigative stop. Because the officers had no reasonable nor articulable suspicion to conduct an investigative stop, any consent given by Appellant was invalid.

The officers testified at the suppression hearing that when they noticed, approached, and ultimately arrested Appellant, they were working "a DEA developed profile to interdict drug couriers in the Pittsburgh area." (Trial Transcript, September 11, 1990, at 2). This explanation, although given frequently by narcotics officers as justification for approaching a "suspicious" individual, has generated much controversy. This same court in the recent decision of *Commonwealth v. Daniels*, 410 Pa.Super. 275, 599 A.2d 988 (1988), criticized the application of the drug courier profile because the profile is not a national profile; it varies depending on the city, airport, or law enforcement agency using it; is subject to racial and gender abuse; envelopes contradictory characteristics; potentially includes an inordinate amount of innocent behavior; and is unclear about the number of characteristics that may warrant an airport stop. *Daniels*, 599 A.2d at 990, n. 1, citing Note, The Drug Courier Profile and Airport Stops: Reasonable Intrusions of Suspicionless Seizures? 12 Nova.L.Rev. 273, 288–296.[2]

**2.** Use of drug courier profiles has also been questioned since its ability to accurately predict criminal activity and not intrude on citizens who are not engaging in unlawful behavior has not been conclusively established. The sparse statistical data that has been reported hardly champions the continued application of profiles. For instance, the Pittsburgh Press reported the results of Common Pleas Judge Walter R. Little's order for an Allegheny County narcotics detective to set forth statistics regarding the race of passengers he has investigated in his 2 and ½ years on the interdiction team. He reported that about fifty per cent of the 96 travelers he has questioned or arrested have been black,

■ When police officers assert, as they do here, that their initial suspicion of a person is based on apparent compliance with certain drug courier profile characteristics, they must introduce the complete and proven profile if they wish to rely on it to justify an investigatory stop. When the conduct described in the profile is innocuous and consistent with non-criminal activity, the officers must establish that the sum total of all of the conduct observed leads, consistently and substantially more often than not, to the apprehension of a drug courier. Unless and until law enforcement officials can prove that there exists a firmly established successful drug courier profile, they simply may not use such alleged "profile characteristics" absent any other objective criteria in order to justify an investigative stop.[3] A mere showing of innocent behavior is insufficient.

The United States Supreme Court case of *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), is consistent with our analysis. In a factually analogous situation, petitioner Reid was approached by a DEA agent who was stationed at the Atlanta Airport in order to uncover "illicit commerce in narcotics." *Id.* at 439, 100 S.Ct. at 2753. Reid was observed, while debarking an incoming flight and proceeding through the airport. He occasionally looked back in the

six per cent were Hispanic, and forty-four per cent were white. "Courts eye rights violations by drug-busters at airport." The Pittsburgh Press, March 22, 1992, at ___, col. ___. Even more startling, however, is the pathetic lack of success the profile reportedly had notwithstanding its repeated use. The same article revealed that since July of 1988, police working the airport drug interdiction unit interdicted 1,542 travelers and arrested 131 suspected drug couriers—*a mere eight per cent. Id.* Clearly, if these statistics are correct, the drug courier profile has not resulted in an overwhelming increase of successful investigatory stops and arrests.

3. If the police are using a newly created profile, they must establish the basis for each characteristic being included in the profile and how the sum total of those characteristics observed and relied upon lead substantially more often than not to a drug carrier.

If they are using an established profile, they must be able to demonstrate its success rate. Clearly, if the rate of success is as dismissal as has been reported, the profile cannot be used.

In either event, the profile must be clearly defined and be able to identify accurately and substantially more often than not those engaging in prohibited behavior to be permitted.

direction of a man several persons behind him. When they reached the main lobby of the terminal, the second man caught up with Reid, the two men spoke briefly and then left together. The DEA agent approached the men, identified himself and asked them to present their airline tickets and identification, which they did. The tickets indicated that Reid had paid for both tickets with his credit card and that the trip lasted one day. The agent then asked the men if they would agree to return to the terminal and consent to a search of their persons and their bags. Both agreed. However, when they entered the terminal, Reid began running and eventually dropped his bag, which was found to contain cocaine.

The Superior Court of Fulton County, Georgia, granted Reid's motion to suppress the cocaine, concluding that the DEA agent possessed no articulable suspicion that Reid was carrying drugs. The Georgia Court of Appeals reversed, holding that the stop was permissible because Reid fit the profile and furthermore, had consented to the search before attempting to flee. The Supreme Court, however, in a per curiam opinion held that "the agent could not as a matter of law, have *reasonably* suspected [Reid] of criminal activity on the basis of [the] observed characteristics."[4] *Id.* at 441, 100 S.Ct. at 2754. Emphasis added. The Supreme Court found that Reid's only particularized behavior was that he occasionally turned around and glanced at another person, later determined to be his companion. Such behavior was arguably indicative of innocent behavior which the agent chose to characterize as an attempt at concealment. The Court found that the other mentioned conduct encompassed too large a category of innocent behavior to justify a stop and search. The Georgia Court of Appeals judgment was reversed and the case remanded.

4. The DEA agent claimed that Reid fit the drug courier profile based on the following factors: (1) Reid had arrived from Fort Lauderdale, a supposed source city for drug traffic; (2) Reid arrived early in the morning when law enforcement activity is relatively slow; (3) Reid and his companion appeared to be trying to conceal the fact that they were traveling together; and (4) they had no luggage other than their shoulder bags.

*Commonwealth v. Bennett,* 412 Pa.Super. 603, 604 A.2d 276 (1992) lends additional support for the result we reach today. There, in an Opinion authored by our esteemed colleague Judge Donald E. Weiend, this court commented that the weakness of certain profile characteristics "in generating a reasonable suspicion of wrongdoing—independent of any force derived from their use in demonstrably helpful law enforcement 'profiles'—is obvious...." *Id.* 604 A.2d at 286, quoting *United States v. Gooding,* 695 F.2d 78 at 83–84 (4th Cir.1982). The Bennett court concluded that the conduct described by the narcotics detectives as implicating the profile [5] was of such a general nature that it could have been found in a vast number of innocent travelers. *Bennett,* 412 Pa.Super. at 624 and 604 A.2d at 286. We concluded that the police did not have reasonable suspicion sufficient to detain the defendant for questioning.

We likewise conclude that the officers in this case had no reasonable suspicion which would justify an investigatory stop. Appellant's consent to the search of his bag and his person which followed the wrongful detention did not cure the illegality.

In *Commonwealth v. Lopez,* 415 Pa.Super. 252, 609 A.2d 177 (1992), petition for allowance of appeal denied 533 Pa. 598, 617 A.2d 1273, the defendant was driving a rental truck towing a Volkswagen. A state police officer noticing that the safety chains between the truck and the Volkswagen were not crossed as required by section 4905(d) of the Pennsylvania Vehicle Code, signaled Lopez to pull over. The officer requested Lopez' driver's license, vehicle registration, and rental agreement. After concluding that Lopez' papers were in order, the officer, rather than release him, continued to question Lopez and eventually requested permission to search the truck and the Volkswagen. Lopez consented to the search of the Volkswagen, which revealed a cache containing approxi-

5. The officers stated that the factors that caused them to focus on Bennett were "(1) his arrival from a source city; (2) his casual manner of dress; (3) his making of brief, animated telephone calls; (4) his not having any checked baggage; and (5) his carrying of only a single item of carry on luggage" *id.* 412 Pa.Super. at 619, 604 A.2d at 284.

mately seventy-six pounds of marijuana; he was then placed under arrest. His motion to suppress was denied, and, following conviction, he was sentenced to five to ten years imprisonment. This court on appeal held that when Lopez produced a valid driver's license and registration, he should have been permitted to proceed on his way, "without being subject to further delay by police for additional questioning." *Id.*, 609 A.2d at 182, citing *United States v. Guzman,* 864 F.2d 1512, 1519 (10th Cir.1988). We held that "no objective circumstances suggested that Lopez ... had committed any crime more serious than the failure to cross the tow chains." *Id.* Thus, in order to justify an extended detention, the officer needed reasonable suspicion, which he simply did not have. *Id.* The court stated: "Because we conclude that the detention of Lopez was illegal, Lopez's consent to the search of the Volkswagen was tainted by the illegality and was ineffective to justify the search." *Id.* citing *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Commonwealth v. Daniels,* supra. Similar reasoning applies to this case with regard to Mr. Jackson's consent. The officers were not permitted to escalate the encounter to an investigatory stop absent any reasonable suspicion. As such, it was an illegal detention, and any consent given following that detention was invalid.

We conclude, therefore, that the trial court erred in failing to suppress the evidence obtained as a result of the search of Mr. Jackson. The judgment of sentence is vacated and the case is remanded for a new trial. Jurisdiction relinquished.

CERCONE, J., files a dissenting opinion.

CERCONE, Judge, dissenting.

I respectfully dissent from the opinion expressed by the majority. The majority finds that the police officers' first contact with appellant was a "mere encounter." However, majority concludes that when the officers "maneuvered Appellant out of the line of traffic and continued to question him without reason, they went beyond the scope of a mere encoun-

ter and escalated the confrontation into an investigatory stop." Opinion at 1233. I disagree. Based on the evidence presented at the suppression hearing, I cannot find that the mere encounter initiated by the three police officers escalated into an investigatory stop.

When reviewing a ruling of the suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as, fairly read in the context of the record as a whole, remains uncontradicted. *Commonwealth v. Cortez,* 507 Pa. 529, 532, 491 A.2d 111, 112 (1985), *cert. denied,* 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985). "Assuming that there is support in the record, we are bound by the facts as are found and we may reverse the suppression court only if the legal conclusions drawn from those facts are in error." *Id.*

Not all interactions between the police and citizens involve seizure of persons. Only when the police have restrained the liberty of a person by show of authority or physical force may we conclude that a seizure has occurred. *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988). "An evaluation as to whether a seizure has occurred must be viewed in light of all the circumstances and *whether a reasonable person would have believed he or she was free to leave.*" *Id.* at 572, 108 S.Ct. at 1979 (emphasis added). As recognized by this court in *In re Interest of Jermaine,* 399 Pa.Super. 503, 582 A.2d 1058 (1990), *allocatur denied,* 530 Pa. 643, 607 A.2d 253 (1992), the purpose of the Fourth Amendment to the United States Constitution as well as the purpose of Article 1 Section 8 of the Pennsylvania Constitution, is:

"to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Martinez–Fuerte,* 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976). As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.... "But if the person refuses to

answer and the police take additional steps ... to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure."

*In re Jermaine, supra,* 399 Pa.Super. at 509–11, 582 A.2d at 1061.

This court has defined the various types of encounters involving police officers and suspects:

A police encounter with a suspect may properly be characterized as a mere encounter, an investigative detention, a custodial detention, or a formal arrest.... *A 'mere encounter' (or request for information) need not be supported by any level of suspicion, but it carries no official compulsion to stop or to respond....* An 'investigative detention' must be supported by reasonable suspicion; it subjects the suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest.... A 'custodial detention' must be supported by probable cause; it is deemed to arise when the conditions and/or duration of an investigating detention become so coercive as to be the functional equivalent of arrest.... Formal arrest requires probable cause, and needs no further definition.

*Commonwealth v. Lidge,* 399 Pa.Super. 360, 367, 582 A.2d 383, 386 (1990), *allocatur denied,* 527 Pa. 598, 589 A.2d 689 (1991) (emphasis added) (quoting *Commonwealth v. Douglass,* 372 Pa.Super. 227, 238–39, 539 A.2d 412, 417–18 (1988) (citations omitted)). If a person is involved in a permissible police encounter, his consent, if voluntary, to search his or her luggage would allow the products of the search to be admissible against that person. *Commonwealth v. Lidge,* 399 Pa.Super. at 368–69, 582 A.2d at 387.

A close reading of the transcript of the suppression hearing establishes that appellant was not illegally detained and, as such, there was no seizure of his person in the present case. Keeping in mind our standard of review, the evidence establishes that the three officers approached appellant and identi-

fied themselves by name, asking appellant if he would mind speaking with them. N.T. 9/11/90 at 9. The officers informed appellant that he did not have to consent, but appellant responded that he wouldn't mind speaking with them at all. *Id.* at 9, 68. The officers were not wearing uniforms, and no weapons were visible on their persons. *Id.* at 29, 30, 49, 63–64.

When asked, appellant indicated that he would not mind stepping out of the way of airport pedestrian traffic. *Id.* at 57. The three officers, followed by appellant, walked about ten to fifteen feet to a recessed area. *Id.* at 57, 67. Officer Korczyk described the area as follows:

> Well, if you were walking down this hallway there would be a cut out section where—it would be 10 foot [sic] or so wide and 5 or 6 feet deep. It's actually for the people that would be waiting for the elevator to stand so they wouldn't be interfering with the normal flow of traffic in the airport.
>
> \*    \*    \*    \*    \*    \*
>
> [T]here are three walls, and it's open on the one side. There's a stairwell and an elevator in that indentation, all of which are exits.

*Id.* at 73–74. Appellant was not blocked into the area and was in full view of the public. *Id.* at 74. No officer touched or grabbed appellant. *Id.* at 29.

Appellant showed his ticket to the officers, who read and returned it. *Id.* at 39. When appellant offered to allow the officers to search his bag, the officers responded "You don't have to let us look into the bag," to which appellant stated "No, it's okay, go ahead." *Id.* at 10–11, 31. At that point, one of the officers asked if appellant would consent to a pat down search to which appellant stated "Sure, go ahead." *Id.* at 52. The officers advised appellant that he had a right not to consent to the pat down search. *Id.* at 53. Beyond looking at the identification and ticket presented by appellant, the officers did not retain any of appellant's belongings. *Id.* at 59.

I cannot agree with the majority's conclusion that the evidence established that the mere encounter with appellant

escalated into an investigative stop. The majority makes much of the fact that the officers "maneuvered" appellant out of the line of traffic and continued questioning him without reason. However, the majority overlooks the fact that the encounter had not yet begun when the officers and appellant stepped to the side of the corridor. The only question asked of appellant at that point in time was whether he would mind answering the officers' questions. Appellant was fully informed that he did not have to give his consent.

Moreover, in reviewing cases involving drug interdiction at airports, we cannot disregard the realities of the airport environment or common sense. Common sense would dictate that during the Thanksgiving holiday season, standing in the middle of an airport corridor would create a hazard not only for appellant, but for other travelers as well. Stepping to the side to avoid being "trampled" does not, in itself, create a coercive condition thereby turning the encounter into an investigative stop. Especially where, as here, no questions had yet been posed to appellant.

The record clearly reveals that the three officers never indicated, in any manner, that appellant was not free to terminate the questioning and vacate the area. It is also clear from the testimony that it was *appellant*, not the police officers, who initiated the search of his bag. When an officer asked if appellant would consent to a pat-down search, the officer again informed appellant that he did not have to consent to the search. A review of the record discloses that the officers never acted in a threatening manner and in fact, told appellant at every stage of the encounter that he had the right to withhold his consent. Based on this evidence, I must conclude that a reasonable person would have believed he was free to leave at any point during the encounter. The evidence does not establish that the encounter escalated into an investigatory stop.

Accordingly, I would affirm the judgment of sentence imposed by the trial court.