721 A.2d 336

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Ramona BOSWELL, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 23, 1997.

Decided Nov. 24, 1998.

276

John W. Packel, Owen Larrabee, Philadelphia, for appellant.

Catherine Marshall, Mary L. Porto, Philadelphia, for Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## ORDER

PER CURIAM:

The Court being equally divided, the Order of the Superior Court is affirmed.

Justice NEWMAN files an opinion in support of affirmance in which Justice CAPPY and CASTILLE join.

Justice NIGRO files an opinion in support of reversal in which Chief Justice FLAHERTY and Justice ZAPPALA join.

## OPINION IN SUPPORT OF AFFIRMANCE

NEWMAN, Justice.

Ramona Boswell (Boswell) appeals from the Superior Court's Order, which reversed the suppression of evidence seized during a drug interdiction program at the Philadelphia International Airport, and remanded for further proceedings. The issue before us is whether the interaction between Boswell and several officers at the airport constituted a "seizure." For the reasons set forth below, we affirm the Order of the Superior Court.

## *FACTS AND PROCEDURAL HISTORY*

A drug interdiction unit of the Pennsylvania State Police, Bureau of Drug Enforcement Tactical Narcotics was on duty at the Philadelphia International Airport on September 23, 1994. The purpose of the drug interdiction unit was to observe and investigate travelers who arrive from "source cities." "Source cities" are those locations from which bulk quantities of drugs are subdivided and distributed to other locations.

Trooper William Knightly, a member of the unit, was on duty on September 23, 1994, when U.S. Air flight 412 arrived at approximately 6:00 a.m. Flight 412 was a nonstop flight from Los Angeles, California (a source city) to Philadelphia. Trooper Knightly observed the departing passengers, including Boswell. He testified that when Boswell exited the plane, she appeared nervous. She continuously looked around, repeatedly looked over her shoulder, and walked unusually slowly down the corridor toward the baggage claim area. Trooper Knightly, together with two other members of his unit and two officers from the Philadelphia Police Department, followed Boswell to the baggage claim area. All of the officers were dressed in plain clothes and did not display their weapons.

Boswell retrieved a gray tweed suitcase, which a skycap carried. The officers continued to follow Boswell when she and the skycap exited the airport and proceeded to walk down the concourse. Officer Howard, a member of the Philadelphia Police Department, and Trooper Knightly approached Boswell and stood approximately two to three feet in front of her. Two other officers stood in the vicinity behind them and another officer stood off to the side. Directly behind Boswell was the walkway to the next terminal and there was a wall "a couple of feet" away to one side of Boswell. On the other side was the roadway for taxis and buses. The officers immediately identified themselves as law enforcement officers and displayed their badges. There is no indication that Boswell knew that the other officers standing in the vicinity were present.

Officer Howard asked Boswell if they could speak with her and she agreed. He then inquired whether she had been travelling. She responded that she had been travelling, and that she had arrived from Los Angeles. He requested to see her ticket, which she gave him. The ticket verified that Boswell had arrived on the direct flight from Los Angeles, but was in the name of Crystal Roger Parker. The officers were unaware at this point that the ticket was in a name other than Boswell's true name. Officer Howard pointed to the gray tweed suitcase and asked if it was Boswell's bag. She said that it was.

Trooper Knightly testified that the following exchange then took place between Officer Howard and Boswell:

A: Officer Howard pointed down at the bag and said: "Is this your bag?" She stated, "Yes, it is." Officer Howard then asked: "Would you mind if I take a look inside this bag?" At that time, she said: "Yes."

The Court: Wait a minute, hold it. He said: "Would you mind if I took a look inside this bag, and she said: "Yes," meaning that she would mind, right?"

A: No, that he could do it.

Notes of Testimony (N.T.), November 11, 1994, at 20–21. On cross-examination, Trooper Knightly clarified that when asked if she would mind if they looked in her bag, she said, "Go ahead." N.T. at 35. He stated that he could not recall her exact words, but that she answered in the affirmative. *Id.*

Boswell told the officers that she did not have the key to the lock on the suitcase, nor did she have any identification. As Officer Howard was opening the lock with a pen, Boswell told Trooper Knightly that someone else had packed the bag, and asked her to deliver it to Philadelphia. She also told him that she did not pay for the ticket and her name was not on the ticket. After successfully opening the lock, Officer Howard discovered nine packages of marijuana wrapped in cellophane in the suitcase. The officers then placed Boswell under arrest, and charged her with knowingly and intentionally

possessing a controlled substance,[1] and possession of a controlled substance with intent to deliver.[2]

On November 11, 1994, Boswell made a motion to suppress the evidence in the Municipal Court of Philadelphia (suppression court). The Commonwealth called Trooper Knightly as a witness and Boswell did not present any evidence. The suppression court granted the motion. The Commonwealth appealed to the Court of Common Pleas by filing a Petition for a Writ of Certiorari pursuant to 42 Pa.C.S. § 934. The Court of Common Pleas denied the Commonwealth's appeal, thereby affirming the suppression court's Order on March 22, 1995.

The Commonwealth certified in good faith that the suppression of the evidence terminated or substantially handicapped its prosecution, and appealed to the Superior Court. 42 Pa.C.S. § 5105; *Commonwealth v. Dugger*, 506 Pa. 537, 546–47, 486 A.2d 382, 386 (1985). The Superior Court reversed the suppression of the evidence after concluding that a seizure did not take place. We granted Boswell's Petition for Allowance of Appeal to decide whether the police action rose to the level of a seizure.

## DISCUSSION

When the Commonwealth appeals an order suppressing evidence, we apply the following standard of review:

[W]e consider only the evidence of the defendant's witnesses and the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. We are bound by the [suppression] court's findings of fact if they are supported by the record, but we must examine any legal conclusions drawn from those facts.

*Commonwealth v. Pickron*, 535 Pa. 241, 246, 634 A.2d 1093, 1096 (1993). Since Boswell did not present any witnesses during the suppression hearing, we look only to the Commonwealth's evidence. With this standard in mind, we must

1. The Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, P.L. 233, *as amended*, 35 P.S. § 780–113(a)(16).

2. 35 P.S. 780–113(a)(30).

decide whether the officers' encounter with Boswell constituted a mere encounter, an investigative detention, or a seizure. *Commonwealth v. Ellis,* 541 Pa. 285, 293–94, 662 A.2d 1043, 1047–48 (1995). If we conclude that it was more than a mere encounter, we will examine whether the police possessed reasonable suspicion that she was engaged in criminal activity, or whether they had probable cause. *Id.*

The Fourth Amendment of the United States Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures...." Article I, § 8 of the Pennsylvania Constitution similarly provides, in part: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures...."[3] No constitutional provision prohibits police officers from approaching a citizen in public to make inquiries of them. The United States Supreme Court has stated that "the Fourth Amendment permits police officers to approach individuals at random in airport lobbies and other public places to ask them questions and to request consent to search their luggage, so long as a reasonable person would understand that he or she could refuse to cooperate." *Florida v. Bostick,* 501 U.S. 429, 431, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). Consequently, not every encounter is so intrusive so as to trigger constitutional protections. *Terry v. Ohio,* 392 U.S. 1, 20, n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *In the Interest of Jermaine,* 399 Pa.Super. 503, 582 A.2d 1058 (1990), *allocatur denied,* 530 Pa. 643, 607 A.2d 253 (1992). It is only when the officer, by means of physical force, or by displaying or asserting authority, restrains the liberty of the citizen that a "seizure" occurs. *Terry,* at 20, n. 16, 88 S.Ct. 1868. " '[A]ny curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity.' " *Commonwealth v. Lewis,* 535

---

**3.** Boswell is not seeking to expand the rights that have already been held to exist pursuant to the Pennsylvania Constitution. Brief at 26–27, n. 22. *See Commonwealth v. Lewis,* 535 Pa. 501, 636 A.2d 619 (1994); *Commonwealth v. Matos,* 543 Pa. 449, 672 A.2d 769 (1996).

Pa. 501, 636 A.2d 619 (1994) (quoting *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980)).

Interaction between police and citizens may be characterized as a "mere encounter," an "investigative detention," or a "custodial detention." Police may engage in a mere encounter absent any suspicion of criminal activity, and the citizen is not required to stop or to respond. *Commonwealth v. Vasquez*, 703 A.2d 25, 30 (Pa.Super.1997). If the police action becomes too intrusive, a mere encounter may escalate into an investigatory stop or a seizure. *Commonwealth v. Jackson*, 428 Pa.Super. 246, 249, 630 A.2d 1231, 1233 (1993). If the interaction rises to the level of an investigative detention, the police must possess reasonable suspicion that criminal activity is afoot, and the citizen is subjected to a stop and a period of detention. *Id.* Probable cause must support a custodial detention or arrest. *Id.*

To decide whether a seizure has occurred, we apply the following objective test: "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person .that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 439, 111 S.Ct. 2382. In applying this test, it is necessary to examine the nature of the encounter. *Commonwealth v. Lewis*, 535 Pa. 501, 508, 636 A.2d 619, 623 (1994). Circumstances to consider include, but are not limited to, the following: the number of officers present during the interaction; whether the officer informs the citizen they are suspected of criminal activity; the officer's demeanor and tone of voice; the location and timing of the interaction; the visible presence of weapons on the officer; and the questions asked. *Terry v. Ohio, supra* ; *Jermaine*, 399 Pa.Super. at 508–509, 582 A.2d at 1060–61. *See also United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). "[O]therwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Mendenhall*, at 555, 100 S.Ct. 1870.

Because a bright line does not exist to delineate between the various levels of interaction between police and citizens, we find it instructive to examine cases from this Court and the Superior Court.

## Mere Encounter

The Superior Court found that a seizure did not occur in *In the Interest of Jermaine, supra.* In *Jermaine,* two Amtrak Police Officers in plain clothes approached Kathleen Jermaine (Jermaine) in Philadelphia's 30th Street Train Station. They inquired whether they could ask her some questions, and she agreed. One of the officers asked if she had just come in on the train, to which she stated yes, she had just come from New York. When the officer questioned whether she had a ticket or receipt, she responded that she did not. She further revealed that she did not have any identification, but told the officers her name. Jermaine then asked why they had stopped her. The officer replied that they were part of a narcotics interdiction team that was "going to stop the flow of narcotics in Philadelphia by way of Amtrak trains." *Id.* at 506, 582 A.2d at 1059. He asked if she would give consent to search her bag. When she did not reply, he repeated the question, and she consented. The officer found a large amount of white powdery substance that was determined to be cocaine. The Superior Court held that the evidence should not be suppressed because this interaction did not rise to the level of a seizure. The court reached this conclusion based on the following facts: the officers did not display their weapons or otherwise exert their authority to suggest coercion; neither officer physically blocked Jermaine's path; the officers did not speak to her in a threatening manner; and, although they identified themselves as members of a drug interdiction unit, they did not inform Jermaine that they suspected her of drug activity. Accordingly, Jermaine's Fourth Amendment rights were not implicated. *Id.* at 514, 582 A.2d at 1063.

In *Commonwealth v. Lidge,* 399 Pa.Super. 360, 582 A.2d 383 (1990), *allocatur denied,* 527 Pa. 598, 589 A.2d 689 (1991), the Superior Court similarly held that a seizure did not occur

where two officers approached Tommie Lidge (Lidge) in the Pittsburgh International Airport. After checking in for her commuter flight, Lidge took a seat in the center of the empty passenger waiting area. The two officers approached her, sat to one side of her, identified themselves, and inquired whether she would mind speaking to them. Lidge replied that she would not mind. The officers inquired about her route then asked to see her ticket, and she complied. When asked if she had any identification, Lidge responded that she did not and queried whether she had done anything wrong. The officers explained that she had not done anything wrong, but they were patrolling the airport and she matched the "drug courier profile," which inspired them to speak with her. They asked her if she would mind if they searched her bag and informed her she did not have to consent and the inquiry would end. She agreed to let them search her bag, and the officers found cocaine. The Superior Court held that no seizure took place because the location and manner of the encounter, coupled with the fact that the officers did not restrain Lidge by use of physical force or a show of authority, would have led a reasonable person to believe she was free to decline the questions. *Id.* at 366, 582 A.2d at 386.

In another airport confrontation case, the Superior Court held that what began as a mere encounter escalated into an investigative detention in *Commonwealth v. Todd*, 401 Pa.Super. 106, 584 A.2d 1002 (1991). In *Todd*, two officers were on patrol as part of a drug interdiction program at the Pittsburgh International Airport when they noticed Carletta Todd (Todd) disembark from a flight from Miami, Florida (a source city). The officers noted that she walked deliberately and awkwardly, as if something were restricting the movement of her legs. After seeing her carry-on luggage go through the x-ray machine at the security check and noticing two oblong packages, they approached her and identified themselves. Both officers were in plain clothes. They questioned her about where she had been, asked to see her ticket, and requested identification. She replied that she had been in Florida visiting family, but

she had no identification. They asked for consent to search Todd's suitcase, and explained that she had the right to refuse. Todd consented, but then retracted her consent and refused. Upon further questioning regarding her identification, Todd stated that it had been stolen from her hotel room. Because this was inconsistent with her prior statement that she had been visiting family, the officers decided to conduct a pat-down search, which revealed four plastic bags of cocaine taped to Todd's belly. The trial court held that reasonable suspicion existed to warrant the pat-down search, therefore it did not suppress the evidence. *Id.* at 109–110, 584 A.2d at 1003–1004. The Superior Court vacated and remanded, finding that the interaction between police and Todd constituted a mere encounter, but only up to the point where she refused the search. *Id.* at 112–114, 584 A.2d at 1005. Once she withdrew her consent and the officers conducted a pat-down search, the Superior Court held that the encounter developed into a custodial detention, for which probable cause did not exist. *Id.*

Likewise, in *Commonwealth v. Stubblefield,* 413 Pa.Super. 429, 605 A.2d 799 (1992), *allocatur denied,* 533 Pa. 633, 621 A.2d 580 (1993), the Superior Court held that a mere encounter occurred where two officers approached a citizen in an airport and asked a series of questions regarding flight itinerary, identification, and travel plans. The officers then asked her to step out of the line of pedestrian traffic to a nearby ticket counter. Because the officers essentially restrained the citizen's liberty and physically impeded her movement by asking her to step out of the line of traffic, the Superior Court held that the mere encounter ripened into an investigative stop or detention. *Id.* at 437, 605 A.2d at 803. Because the stop or detention was supported by reasonable suspicion, the Superior Court did not suppress the evidence. *Id.* at 439, 605 A.2d at 803. *See also Commonwealth v. Jackson, supra* (mere encounter escalated to investigatory detention when police maneuvered citizen out of line of pedestrian traffic into a hallway near an elevator and a set of stairwells).

## Investigatory Detention

As an example of an investigatory detention, we look to *Commonwealth v. Lewis, supra*, where this Court considered an encounter between police and two men at an Amtrak station in Harrisburg. In that case, four officers in plain clothes confronted Troning Lewis (Lewis) and Eric Bradley (Bradley) when they exited an Amtrak train in Harrisburg, and told them they were conducting a drug interdiction program and checking for couriers bringing drugs back from New York. The officers asked to speak with the two men. Lewis and Bradley backed away from the officers, who followed for approximately five to ten feet until the men were backed up to a wall with benches. One of the officers informed them that they had been observed traveling between New York and Harrisburg and asked for an explanation. *Id.* at 506, 636 A.2d at 622. The men offered an explanation, but one of the officers testified that they appeared extremely nervous, to the point that the officer told Bradley to stop moving his hands. The police continued to question the two men, and they eventually asked whether either was carrying a weapon. The officers decided to search both men, and they found a pistol on Bradley's person. The officers arrested them and read them their *Miranda* rights.

Lewis and Bradley moved to suppress the evidence as the fruit of an illegal stop. The trial court denied the motion, and the Superior Court affirmed. This Court, however, held that the interaction between the police and Lewis and Bradley amounted to an investigatory stop that was not supported by reasonable suspicion or probable cause. Therefore, the detention violated the Fourth Amendment of the U.S. Constitution, and Article 1, § 8 of the Pennsylvania Constitution. *Id.* at 507, 636 A.2d at 622. After applying the objective "free to decline" test to the facts, this Court stated the following:

> [W]e find that under the totality of the circumstances, the police conduct would have communicated to a reasonable person that the person was not free to leave. It is not our intention to single out the fact that the Appellants were confronted by four police officers as dispositive of our

inquiry, but the nature of the confrontation demonstrated a show of authority which constituted a restraint of the Appellants' liberty. We hold that a seizure occurred in this case.

*Id.* at 509, 636 A.2d at 623.

With these examples in mind, we next turn to the case *sub judice.* Relying on the lower court's findings of facts, the Superior Court reached a different conclusion of law than the suppression court. *See Pickron, supra* (when reviewing appeal from an order suppressing evidence, we are bound by the suppression court's findings of fact but we may review the conclusions of law drawn therefrom). It held that based on the facts elicited during the suppression hearing, a reasonable person would have felt free to refuse to answer the officers' questions and go about his or her business. We agree. There is nothing in the record to indicate that the officers, by physical force or show of authority, restrained Boswell's liberty. Consequently, her Fourth Amendment and Article I, § 8 rights against unreasonable searches and seizures were not implicated.

Here, two officers dressed in plain clothes approached Boswell on the concourse of a busy airport. There is no indication that Boswell was aware of the additional members of the drug interdiction unit who did not stand with the questioning officers. They did not block her path and they did not display any weapons. Furthermore, they did not inform her that they were part of a drug interdiction team, nor did they alert her that they suspected her of drug activity. *See Commonwealth v. Martin,* 705 A.2d 887, 891 (Pa.Super.1997) ("A statement by a law enforcement official that a person is suspected of illegal activity is persuasive evidence that the Fourth Amendment and Article I, Section 8 of the Pennsylvania Constitution have been implicated."); *Jermaine.* Instead, they asked her if she would mind speaking with them. Unlike *Lewis,* Boswell agreed to speak with the officers. The officers questioned her regarding her travel and asked to see her ticket. There is nothing in the record to indicate that their tone of voice was

authoritative or demanding and the content of their questions was general and not accusatory.

Moreover, contrary to the situation in *Lewis,* here the officers did not back Boswell up against a wall. According to the uncontradicted testimony, the officers did not impede her movement or physically restrain her. Furthermore, unlike *Jackson* and *Stubblefield,* the officers did not request that Boswell step out of the line of pedestrian traffic. The encounter occurred in a very public and well-traveled area. Based on the evidence elicited at the suppression hearing, we agree with the Superior Court that a reasonable person would have felt free to decline to answer the officers' questions and go about his or her business. *Bostick.* Thus, the interaction between Boswell, Officer Howard, and Trooper Knightly was a mere encounter, and did not rise to the level of an investigatory detention. Reasonable suspicion or probable cause, therefore, were not required. *Jermaine.*

### Consent

Boswell also argues that she did not consent to the officers' search of her bag. Where a citizen is involved in a constitutionally permissible encounter with the police, he or she may voluntarily consent to a search. *Lidge.* Only Trooper Knightly testified at the suppression hearing. His uncontradicted testimony was that he did not recall Boswell's exact words, but that her response to the question of whether she would mind if they searched your bag was in the affirmative. Boswell did not present any evidence to support her claim that she did not consent. Accordingly, since the initial encounter between Boswell and the officers was legally permissible, her consent was valid.

### CONCLUSION

We conclude, therefore, that a seizure did not occur in this case because the officers did not restrain Boswell's liberty, and Boswell consented to the search of her suitcase. Therefore, we affirm the Superior Court's Order reversing the

suppression of evidence and remanding for further proceedings.

Justice NIGRO files an opinion in support of reversal in which Chief Justice FLAHERTY and Justice ZAPPALA join.

## OPINION IN SUPPORT OF REVERSAL

NIGRO, Justice.

I respectfully disagree with the Opinion in Support of Affirmance. For the following reasons I believe that the interaction between Boswell and the officers at the airport constituted a seizure and that the evidence thereby obtained should have been suppressed.

The officers claim they made an investigatory stop of Ms. Boswell at the airport because she fit several criteria related to drug traffickers, including, *inter alia,* she arrived non-stop from a "source city," she appeared nervous, walking unusually slowly, while repeatedly looking over her shoulder. While I acknowledge the need for police to conduct intervention activities to prevent the influx of drugs and drug traffickers into the Commonwealth, I do not now address my concerns as to the adequacy of the factual basis on which this subject was stopped. I take issue, however, with police protestations that Ms. Boswell knew she was free to leave, free to refuse a search of her ticket and her luggage and that she was free to refuse to submit to their questions.

Simply because police are plainclothed, and do not display their firearms, or that they speak in a conversational tone and couch their demands as polite requests, does not obviate that they are the police and that that, in and of itself, is intimidating. Without weapons, commands or threats of any kind, they demonstrate their authority merely by displaying their badges and, from that moment forward, the average citizen does not feel "free to leave."

I would call on the Court to end the charade of these coercive detentions which, at suppression hearings, masquerade as mere encounters wherein the subject "willingly" consented to the search and the questioning. An average citizen

under the circumstances would not understand that she was free to leave. Therefore, I would require that police randomly stopping someone on the basis of such a drug courier profile be required to, *minimally* inform the subject 1) that they are the police; 2) that they are investigating drug traffickers; 3) that while they would like to question the subject ... to see identification or a ticket ... would like consent to look into subject's bag, box, luggage, etc., the subject is not required to comply and is *free to leave* without further delay.[1] I would require that at each successive request police must explicitly inform the subject that she is free to refuse to cooperate, and free to leave. It is only by ascertaining that such explicit release was articulated that the courts can determine that the subject understood her right to refuse to cooperate and that she made an informed waiver of her right to leave, refuse to answer, and/or refuse a search.

Therefore, as I believe that an ordinary reasonable—and innocent—person would not have understood her rights under the facts presented, I cannot conclude other than that Ms. Boswell was intimidated by the authority asserted and did not make an informed, knowing waiver of such rights. I agree with the trial court's grant of the motion to suppress and would, therefore, reverse the Superior Court decision.

Justice FLAHERTY and Justice ZAPPALA join.

---

1. I might suggest the following warning: We are police officers investigating drug trafficking. We approached you on a purely random basis and would like to ask you some questions. You have a legal right to decline our requests, a right to refuse to cooperate, and you are free to leave. If you choose not to leave and to comply with our requests, anything revealed through those inquiries may be used against you in legal proceedings. Furthermore, if you agree to cooperate at the outset, you may still refuse at any time to cooperate further; you may end the inquiry and leave. Do you understand that you are under no obligation to comply with our requests at this time?