**COMMONWEALTH of Pennsylvania, Appellant**

**v.**

**John D. AU, Appellee.**

Superior Court of Pennsylvania.

Argued Sept. 24, 2009.

Filed Dec. 1, 2009.

Yvette L. Wilson, Bellefonte, Assistant District Attorney, for Commonwealth, appellant.

Joseph L. Amendola, State College, for appellee.

BEFORE: FORD ELLIOTT, P.J., MUSMANNO, ORIE MELVIN, BENDER, BOWES, PANELLA, DONOHUE, SHOGAN and ALLEN, JJ.

OPINION BY BENDER, J.:

¶ 1 This is a Commonwealth appeal from the order granting John D. Au's (Appellee) motion to suppress evidence. The Commonwealth claims that the trial court erred in granting Appellee's motion. For the following reasons, we affirm.

¶ 2 The trial court summarized the facts of this case as follows:

While on routine patrol on May 31, 2007, Sergeant Ryan Hendrick of the Ferguson Township Police Department observed a vehicle backed in and parked at Watkins Dariette (hereinafter "Dariette") on East Pine Grove Road at approximately 12:29 a.m. The Dariette closed several hours earlier, between 9:00 p.m. and 10:00 p.m. Sgt. Hendrick noted that the car was not parked at the Dariette several minutes earlier when he patrolled the same area. He pulled into the parking lot and positioned his marked cruiser so that his headlights were shining directly into the passenger compartment of the vehicle. The officer did not, however, activate his overhead emergency lights.

After exiting his police cruiser, Sgt. Hendrick, who was dressed in full uniform, approached the passenger's side of the vehicle where Defendant was seated. He discovered that the car had six occupants; two males in the front and four females in the rear. The driver, and also the owner of the car, was later determined to be Jason Price. Sgt. Hendrick asked why they were parked at the Dariette, to which an unidentified female answered "hanging out." He then requested each individual produce a form of identification. Defendant opened the glove box of Mr. Price's car to retrieve his license. Sgt. Hendrick observed, in plain view, two baggies of a green leafy substance that he suspected to be marijuana. He checked Defendant's identification and then walked around the vehicle to the driver's side door, during which time he called for another police officer to assist him on the scene. Sgt. Hendrick then opened

the driver's door and discovered additional baggies of marijuana and paraphernalia. At this time, he arrested both Defendant and Mr. Price, read them their Miranda rights, and separated the two men, placing Defendant in the back of the police cruiser. The four individuals in the back seat of the car were determined to be juveniles and were sent home with their parents.

Sgt. Hendrick spoke first with Mr. Price, at which time, Mr. Price gave a statement claiming possession of all the substances and paraphernalia except the substances contained within the glove box. Sgt. Hendrick then separately questioned Defendant, who denied possession of the marijuana in the glove box, but admitted to smoking marijuana with Mr. Price earlier that day. Prior to making this statement, the officer had reminded Defendant of his Miranda rights, and, Defendant, again, acknowledged that he understood these rights. After verifying that Mr. Price was not under the influence, Sgt. Hendrick informed both Defendant and Mr. Price that they were free to go and would be receiving a summons by mail.

Trial Court Opinion (T.C.O.), 10/30/07, at 1. Prior to trial, Appellee filed a motion to suppress, claiming that he was subjected to an investigative detention that was not supported by reasonable suspicion. The trial court granted the motion on the basis that Officer Hendrick subjected Appellee to an investigatory detention but could not articulate specific facts that would give rise to a reasonable suspicion that criminal activity was afoot. The Commonwealth then appealed presenting the following three questions for our review:

1. Did the court err in finding that the officer did not have the requisite reasonable suspicion necessary to approach Appellee's vehicle, ask to speak to the occupants, and ask for identification?

2. Did the court err in finding that the officer's level of interaction was an investigative detention and not a mere encounter?

3. Did the trial court err in granting the motion to suppress?

Brief for Appellant at 4.

■ ¶ 3 All three of the Commonwealth's questions challenge the trial court's grant of Appellee's motion to suppress.

When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Nester*, 551 Pa. 157, 709 A.2d 879, 880–81 (1998) (citations omitted). We note that while the Commonwealth has presented three separate questions for our review, it presents one joint argument for all three questions.

■ ¶ 4 The Commonwealth claims that when Officer Hendrick first came upon the vehicle, this was a mere encounter requiring no suspicion at all.

Fourth Amendment jurisprudence has led to the development of three categories of interactions between citizens and the police. The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official

compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Ellis,* 541 Pa. 285, 662 A.2d 1043, 1047 (1995) (citations omitted). We agree with the Commonwealth's first contention, as the law clearly recognizes that when an officer approaches a citizen and talks to that citizen without any assertion of authority, then what has transpired is a mere encounter. *See id.*

■ ¶ 5 However, we conclude that this encounter ripened into an investigative detention when Officer Hendrick requested identification from all of the vehicle's occupants.

To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in view of all surrounding circumstances, a reasonable person would have believed that he was free to leave. In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained. In making this determination, courts must apply the totality-of-the-circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred.

*Commonwealth v. Strickler,* 563 Pa. 47, 757 A.2d 884, 888–89 (2000) (citations omitted).

■ ¶ 6 The Commonwealth argues that the circumstances of this case support "the conclusion that the officer was merely trying to determine if Appellee's vehicle (or occupants) were in need of assistance." Brief for Appellant at 14. We disagree. Viewing the totality of the circumstances in the present case, we observe the following. Upon initially approaching the vehicle, Officer Hendrick was in a marked police cruiser and he parked the police car next to the vehicle in which Appellee was seated in the front passenger seat, so that the lights from the police car shined directly into the passenger side. Officer Hendrick, who was dressed in full uniform then approached the vehicle and asked what was going on, to which the occupants responded that they were just hanging out. Officer Hendrick, apparently unsatisfied with this answer, then asked for identification from all of the occupants. This was the moment that the mere encounter transformed into an investigative detention.

¶ 7 In such a situation, no person would have felt free to terminate the encounter and depart the scene; particularly Appellee, who sat there with the headlights of a police car shining into his face. While a person in Appellee's situation may have surmised that the officer initiated the encounter to merely check upon the vehicle and its occupants, the subsequent request for identification from all of the vehicle's occupants would have signaled to any reasonable person that the officer was unsatisfied with the response that the occupants were just hanging out, and that the officer wanted to investigate further. Knowing that the officer sought to investigate further and that this was no longer a situation where the officer was just checking in to see if the occupants were in need of assistance, no reasonable person would have felt free to terminate the encounter. *See Commonwealth v. DeHart,* 745 A.2d 633, 639 (Pa.Super.2000) (holding that an investigative detention occurred when the offi-

cer, after an initial inquiry, exited the vehicle and approached its occupants because the officer "chose to escalate the encounter to afford greater investigation, which, of course, is consistent with the purpose of an investigative detention"). Consequently, we conclude that Appellee was seized at the time that Officer Hendrick requested to see identification.

¶ 8 Up until this point of time, Officer Hendrick had observed no conduct evincing any sort of criminality. Since there was no reasonable suspicion to suspect Appellee of any criminal activity, the investigative detention was constitutionally infirm. Therefore, the trial court correctly granted the motion to suppress.

¶ 9 Order affirmed.

¶ 10 Judge SHOGAN files a dissenting opinion in which President Judge FORD ELLIOTT and Judges ORIE MELVIN and ALLEN join.

## DISSENTING OPINION BY SHOGAN, J.

¶ 1 In this matter, we are called upon to determine whether the suppression court properly ruled that a police officer subjected Appellee to an investigatory detention without the required reasonable suspicion that unlawful activity was in progress. Although the Majority presents a plausible discussion regarding the level of encounter between the police officer and Appellee, I am compelled to register my dissent. Specifically, although the Majority concedes that the interaction was a mere encounter when the police officer first came upon the vehicle, I believe the Majority then incorrectly concludes the encounter between Appellee and the police officer ripened into an investigative detention when Sergeant Hendrick requested identification from the vehicle's occupants.

¶ 2 The standard of review an appellate court applies when considering an order granting a suppression motion is well established and has been summarized as follows:

> We begin by noting that where a motion to suppress has been filed, the burden is on the Commonwealth to establish by a preponderance of the evidence that the challenged evidence is admissible. In reviewing the ruling of a suppression court, our task is to determine whether the factual findings are supported by the record. If so, we are bound by those findings. Where, as here, it is the Commonwealth who is appealing the decision of the suppression court, we must consider only the evidence of the defendant's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted.

Moreover, if the evidence when so viewed supports the factual findings of the suppression court, this Court will reverse only if there is an error in the legal conclusions drawn from those findings.

*Commonwealth v. Lindblom,* 854 A.2d 604, 605 (Pa.Super.2004), *appeal denied,* 582 Pa. 672, 868 A.2d 1198 (2005) (citations omitted).

> With respect to factual findings, we are mindful that it is the sole province of the suppression court to weigh the credibility of the witnesses. *Commonwealth v. Quiles,* 422 Pa.Super. 153, 619 A.2d 291, 292 (1993). Further, the suppression court judge is entitled to believe all, part or none of the evidence presented. *Commonwealth v. Williams,* 411 Pa.Super. 586, 602 A.2d 350, 353 (1992). However, where the factual determinations made by the suppression court are not supported by the evidence, we may re-

ject those findings. *Commonwealth v. Burnside*, 425 Pa.Super. 425, 625 A.2d 678, 680 (1993). Only factual findings which are supported by the record are binding upon this court.

*Commonwealth v. Benton*, 440 Pa.Super. 441, 655 A.2d 1030, 1032 (1995). In addition, questions of the admission and exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *Commonwealth v. Freidl*, 834 A.2d 638, 641 (Pa.Super.2003).

The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from unreasonable searches and seizures, thereby ensuring the "right of each individual to be let alone." *Schneckloth v. Bustamonte*, 412 U.S. 218, 236, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Commonwealth v. Blair*, 394 Pa.Super. 207, 575 A.2d 593, 596 (1990).

*Commonwealth v. By*, 812 A.2d 1250, 1254 (Pa.Super.2002), *appeal denied*, 576 Pa. 710, 839 A.2d 350 (2003).

¶ 3 To secure the right of citizens to be free from intrusions by police, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens as those interactions become more intrusive. *Commonwealth v. Beasley*, 761 A.2d 621, 624 (Pa.Super.2000), *appeal denied*, 565 Pa. 662, 775 A.2d 801 (2001).

¶ 4 It is undisputed that:

State case law recognizes three categories of interaction between police officers and citizens, which include: (1) a mere encounter, or request for information, which need not be supported by any level of suspicion, but which carries no official compulsion to stop or to respond; (2) an investigative detention, which must be supported by reasonable suspicion as it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest; and (3) arrest or custodial detention, which must be supported by probable cause.

*Commonwealth v. Acosta*, 815 A.2d 1078, 1082 (Pa.Super.2003) (*en banc*), *appeal denied*, 576 Pa. 710, 839 A.2d 350 (2003). Thus, as the first level of interaction between police and citizens, a mere encounter is itself a "request for information," which needs no level of suspicion. *Id.*

¶ 5 As we explained in *Commonwealth v. Jones*, 874 A.2d 108 (Pa.Super.2005),

A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond.

*Id.*, at 116 (quoting *Commonwealth v. DeHart*, 745 A.2d 633, 636 (Pa.Super.2000)).

¶ 6 If the police action becomes too intrusive, a mere encounter may escalate into an investigatory stop or a seizure. *Commonwealth v. Boswell*, 554 Pa. 275, 284, 721 A.2d 336, 340 (1998). To effectuate an investigative detention, the officers are required to have reasonable suspicion that unlawful activity was in progress. In order to demonstrate reasonable suspicion, the police must be able to point to specific facts and reasonable inferences drawn from those facts in light of the officer's experience. *Commonwealth v. Cook*, 558 Pa. 50, 57, 735 A.2d 673, 677 (1999).

¶ 7 "Because the level of intrusion into a person's liberty may change during the course of the encounter, we must carefully scrutinize the record for any evidence of such changes." *Commonwealth v. Blair*, 860 A.2d 567, 572 (Pa.Super.2004) (citing *Commonwealth v. Strickler*, 563 Pa. 47,

757 A.2d 884 (2000)). In determining whether a mere encounter has risen to the level of an investigative detention, our inquiry focuses on whether the individual in question has been seized.

> To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in the view of all surrounding circumstances, a reasonable person would believe that he was free to leave. In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained. In making this determination, courts must apply the totality-of-the-circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred.

*Strickler*, 563 Pa. at 58–59, 757 A.2d at 889–890 (citations omitted). Thus, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Commonwealth v. McClease*, 750 A.2d 320, 325 (Pa.Super.2000) (quoting *United States v. Kim*, 27 F.3d 947, 950 (3d Cir.1994)).

In *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the United States Supreme Court explained that there is no "litmus-paper" test for distinguishing a mere encounter from a seizure as follows:

> The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to "leave" will vary, not only with the particular police conduct at issue, but

also with the setting in which the conduct occurs.

*Royer*, 460 U.S. at 506, 103 S.Ct. at 1329.

*By*, 812 A.2d at 1255 n. 1.

¶ 8 We have long considered the following factors in analyzing the conditions surrounding the escalation of police and citizen interactions:

> Circumstances to consider include, but are not limited to, the following: the number of officers present during the interaction; whether the officer informs the citizen they are suspected of criminal activity; the officer's demeanor and tone of voice; the location and timing of the interaction; the visible presence of weapons on the officer; and the questions asked.

*Beasley*, 761 A.2d at 624–625 (quoting *Boswell*, 554 Pa. at 281, 721 A.2d at 340). Otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person. *Id.*

¶ 9 This Court has found that when an officer approaches an individual sitting in a car, a mere encounter has occurred. *See Blair*, 860 A.2d at 573 (concluding mere encounter occurred when officer responding to a report of a domestic dispute approached a vehicle parked in front of the address and spoke to the occupants). Further, in *Commonwealth v. Campbell*, 862 A.2d 659, 665 (Pa.Super.2004), *appeal denied*, 584 Pa. 699, 882 A.2d 1004 (2005), this Court held that a police officer did not unreasonably intrude on a protected privacy right of a passenger in a lawfully stopped vehicle when the officer asked the passenger to identify himself. In reaching this conclusion, the Court in *Campbell* relied upon the following instructive language from the United States Supreme Court's ruling in *Hiibel v. Sixth Judicial*

*District Court of Nevada,* 542 U.S. 177, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004):

> asking questions is an essential part of police investigations. In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment. 'Interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.'

[*Hiibel,*] 124 S.Ct. at 2458, quoting *INS v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).

*Campbell,* 862 A.2d at 665. The Court in *Campbell* ultimately made the following determination:

> [A]sking a passenger for identification is reasonable; a person's name, like his voice or handwriting, is revealed in a variety of daily interactions and there is no legitimate expectation of privacy associated with one's identity. The principle that a person cannot claim the protections of the Fourth Amendment for what he "knowingly exposes to the public" is applicable in this matter.

*Campbell,* 862 A.2d at 665. Similarly, our Supreme Court has held that the identity of a defendant is not information that can be suppressed. *Commonwealth v. Gwynn,* 555 Pa. 86, 100–101, 723 A.2d 143, 149 (1998) (citing *Commonwealth v. Carter,* 537 Pa. 233, 643 A.2d 61 (1994)).

¶ 10 Moreover, it bears worth noting that Pennsylvania courts have held that, even in a public airport or in tightly held locations and situations such as on a stopped passenger bus, the approach by police and subsequent requests for identification do not necessarily reach beyond the level of a mere encounter. *See Commonwealth v. Dowds,* 563 Pa. 377, 387, 761 A.2d 1125, 1130 (2000) (concluding the appellant was not seized under the Fourth Amendment when initially approached by the police in an airport, who were in plain clothes, did not display weapons, identified themselves, explained their duties at the airport, and requested ticket and identification information); *Boswell,* 554 Pa. at 289–290, 721 A.2d at 343 (holding interaction between the appellant and police was a mere encounter where police approached the appellant on an airport concourse, asked her questions about her travel, and asked to see her ticket); *Commonwealth v. Smith,* 575 Pa. 203, 217, 836 A.2d 5, 13–14 (2003) (holding that interaction where police boarded a stopped passenger bus and, upon reaching the appellant's seat, requested to view her identification and ticket and asked questions regarding her destination and luggage, did not amount to a seizure but remained a mere encounter).

¶ 11 Because Appellee did not present any witnesses during the suppression hearing, we must look only to the Commonwealth's evidence. My review of the certified record, applying the totality of the circumstances approach in this matter, reflects the following. At 12:29 a.m., on May 31, 2007, Sergeant Ryan Hendrick, an officer with the Ferguson Township Police Department, was on duty. N.T., 10/4/07, at 4. As Sergeant Hendrick was driving his marked cruiser eastbound on East Pine Grove Road, he observed a vehicle backed into a parking space at a business known as the Watkins Dariette. *Id.* at 4–5, 8, 18. Sergeant Hendrick testified that the business was closed, as it normally closes between 9:00 p.m. and 10:00 p.m. *Id.* at 8, 18. The officer further explained that "[t]his is not a normal place for somebody to be parked and that vehicle was not there shortly before when I drove through going in the other direction." *Id.* at 5. He noted that he could not tell if anyone was in the vehicle. *Id.* at 8. Also, the officer explained that there was no one else in the parking lot other than the vehicle. *Id.* at

10. Sergeant Hendrick stated that, after he observed the vehicle, he turned around and went back to check on the vehicle. *Id.* at 5.

¶ 12 As Sergeant Hendrick pulled into the parking area, he did not turn on his emergency lights. *Id.* at 5. However, as he turned around, he did illuminate the parked vehicle with his headlights and could see that there were several individuals in the vehicle. *Id.* at 9, 19. He testified that he could not tell how many people were in the vehicle, but it looked to be a substantial number. *Id.* at 22. Sergeant Hendrick stated that, when he pulled in, his headlights were facing directly at the passenger—side door, at a 45–degree angle. *Id.* at 22. The sergeant explained that he was not blocking the vehicle's exit if someone had tried to leave, as he was off to the side. *Id.* at 22. In addition, the officer stated that it was a warmer night and all of the windows were rolled up, which he found "a little bit odd for the time of year." *Id.* at 9.

¶ 13 Sergeant Hendrick explained that he exited his cruiser, walked to the vehicle and approached the passenger window as the window was being rolled down. *Id.* at 5–6, 9, 22. Specifically, the officer stated "the passenger was rolling down his window as I walked up so I walked up to him." *Id.* at 22. At that point Sergeant Hendrick observed two people in the front seat and four occupants in the rear seat of the vehicle. *Id.* at 6, 22–23.

¶ 14 Sergeant Hendrick then asked the occupants what was "going on." *Id.* at 6, 23. The officer testified that the occupants replied that they were "hanging out." *Id.* at 6, 23. Sergeant Hendrick also stated that the occupants all looked very young, including Appellee, and he believed that they were under 18 years of age. *Id.* at 6, 24. The officer testified that he then asked if everyone was 18, and

the individuals in the back said "no." *Id.* at 6. At that point, Sergeant Hendrick asked Appellee for his identification. *Id.* at 6, 24. Sergeant Hendrick stated that Appellee then opened the glove box in front of him and the officer noticed two baggies of marijuana in the glove box. *Id.* at 6, 24.

¶ 15 Thus, applying the totality of the circumstances approach in this matter, I am constrained to conclude that the interaction between Sergeant Hendrick and Appellee was not so intrusive as to escalate from a mere encounter to an investigatory stop. Again, in reviewing the factors to be considered concerning whether a seizure has occurred, the record reflects that Sergeant Hendrick was alone when he approached the parked vehicle. There is no evidence that the officer approached the vehicle with any weapon visible to the occupants. Also, Sergeant Hendrick did not inform the occupants that they were suspected of any criminal activity. There is no indication that the officer's demeanor and tone of voice were authoritarian or at all imposing. Indeed, the record reflects that the officer did not activate his overhead emergency lights when he approached the parked car. Regarding the location and timing of the interaction, I do not find it surprising or beyond the realm of acceptability that a vehicle parked in a closed business parking lot would be approached by a police cruiser and a police officer.

¶ 16 Further, concerning the questions asked by the officer, after approaching the parked vehicle, the officer asked the following two innocuous questions before requesting identification: (1) what's going on, and (2) is everyone 18? Contrary to the Majority's conclusion, the request to see identification was not an intrusion of Appellee's privacy. Rather, it is the type of question permitted during a mere en-

counter, which is itself a request for information that needs no level of suspicion. In addition, of significant importance is the testimony which clearly indicates Sergeant Hendrick parked his cruiser in a manner which permitted the parked vehicle to exit the parking lot at any time. Thus, there was not restraint on the movement of Appellee or the vehicle by the conduct of the officer or the placement of the police cruiser. Consequently, in analyzing the factors surrounding the interaction, none of the conditions which would indicate that a seizure occurred were present.

¶ 17 Therefore, it is my conclusion that Appellee's right to be free of unreasonable searches and seizures was not violated when the officer approached the parked vehicle, asked two simple questions of the occupants and requested identification from Appellee. Instead, the interaction between the officer and Appellee bears the hallmark of a mere encounter and never rose to the level of an investigatory detention. For this reason, I would hold that the suppression court erred in reaching the legal conclusion that the police officer subjected Appellee to an investigatory detention without the required reasonable suspicion that unlawful activity was in progress. Accordingly, I respectfully dissent.