J-A23008-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ERIK BURNELL WILLIAMS | : | |
| | : | |
| Appellant | : | No. 1533 MDA 2021 |

Appeal from the Judgment of Sentence Entered November 10, 2021
In the Court of Common Pleas of Adams County Criminal Division at
No(s):  CP-01-CR-0000851-2020

BEFORE:   BOWES, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BOWES, J.:          **FILED: MARCH 21, 2023**

Erik Burnell Williams appeals from the judgment of sentence of two years of probation, which was imposed after the trial court convicted him of driving under the influence ("DUI") of a schedule I controlled substance and DUI of a metabolite of a schedule I controlled substance.  We affirm.

At approximately two a.m. on February 3, 2020, Pennsylvania State Police ("PSP") Troopers Matthew Kile and Justin Horan were patrolling in a marked SUV in Adams County, Pennsylvania, when they observed a Chevrolet Avalanche vehicle traveling approximately one-half mile ahead of them.  **See** N.T. Suppression Hearing, 3/18/21, at 7.  The troopers increased their speed to ten miles per hour above the posted speed limit until they reduced the distance between their vehicle and the Avalanche to approximately two or

---

[*] Former Justice specially assigned to the Superior Court.

three car lengths, allowing them to read the other automobile's license plate. The officers continued to follow the Avalanche while they submitted the tag to their database to ensure the vehicle was properly registered and that there were no outstanding warrants or other issues with the owner. Once the Avalanche came into view, what happened subsequent was captured by the mobile vehicle recorder ("MVR") on the PSP vehicle. **See** Commonwealth Exhibit 1 (capturing the initial driving portion of the interaction); **see also** Commonwealth Exhibit 2 (audio and video recording containing sound and video of the remainder of the encounter between the troopers and Appellant).

Approximately one-tenth of a mile later, the Avalanche signaled and pulled over to the side of the road. The troopers continued driving a short distance before stopping their vehicle to await completion of their database search. Seconds later, the troopers observed the Avalanche proceed past them. Since their inquiry was still in progress, the troopers reentered the highway and continued to follow the Avalanche, though this time at a greater distance. Almost immediately, the vehicle signaled and pulled into the parking lot of the Oxford Township municipal building. Finding it "highly unusual" that a vehicle would pull over twice in such a short period of time without being directed to do so, the officers also entered the parking lot. N.T. Suppression Hearing, 3/18/21, at 11. The troopers parked their SUV to the left rear of the Avalanche without activating their lights or sirens. This positioning allowed the Avalanche multiple points of egress from the parking lot.

The troopers approached the vehicle in a marked uniform with a flashlight. *Id*. at 13. Upon reaching the driver's side window, the troopers observed Appellant yelling into his cellular telephone that he had pulled into the municipal parking lot of his own volition because the police were "harassing" him. *See* Commonwealth Exhibit 2 ("So I pulled over and then they pulled over and then I pulled into the municipal building . . . well they didn't pull me over. They don't have their lights on. They are just fucking here harassing me pretty much."). Noticing that Appellant's speech was slurred, Trooper Kile asked Appellant if he had his license on him and if "everything was alright." *Id*. Appellant confirmed that he had his license and explained that he had pulled over because the officers were "flying up on [him.]" *Id*. Recognizing Appellant's constricted pupils, Trooper Kile asked whether Appellant had recently imbibed any drugs or alcohol. Appellant denied ingesting any such substances and, again, accused the troopers of harassing him. The troopers briefly returned to their vehicle with Appellant's license.

When Trooper Kile reapproached the Avalanche, he observed Appellant still on his cellular phone reiterating that the police had not pulled him over. *Id*. Realizing that Trooper Kile was standing next to him, Appellant stated, for the first time, that he would like to go home. Trooper Kile responded that he would need to check Appellant's pupils before he could allow him to leave, since his speech was slurred. After unsuccessfully attempting to complete field sobriety testing with Appellant still seated in the vehicle, Trooper Kile

- 3 -

asked Appellant to exit the vehicle. Appellant asked the person on the other end of the phone to come to the municipal building immediately because he was being harassed. Appellant then exited the vehicle and engaged in a brief scuffle with the troopers. Afterwards, Appellant remained agitated but complied with their requests to complete multiple field sobriety tests. The scene further devolved when Appellant's brother appeared. Once additional troopers arrived on scene, Appellant was placed under arrest and transported to Hanover Hospital where he consented to a blood draw. The results revealed that Appellant's blood contained the active component and the metabolites of marijuana, a schedule I substance. Appellant produced a valid Pennsylvania medical marijuana card. Based on the foregoing, Appellant was charged with DUI of a schedule I controlled substance and DUI of the metabolites of a controlled substance.

On October 16, 2020, Appellant filed an omnibus pretrial motion seeking suppression of the evidence. Appellant argued that the initial parking lot interaction was not a mere encounter because the troopers initiated the stop by following Appellant's vehicle at a high rate of speed. *See* Omnibus Pretrial Motion, 10/16/20, at ¶ 37. Since the police had forced him off the road, Appellant contended that he did not feel free to leave the parking lot or decline their requests for his identification. *Id*. at ¶¶ 38-39. Accordingly, Appellant averred that he was subjected to an investigatory detention without the requisite reasonable suspicion and all evidence derived from the stop should be suppressed. *Id*.

On March 18, 2021, the suppression court held a hearing on the suppression motion.  After confirming that Appellant only wished to challenge the legality of the initial encounter in the municipal building parking lot, the court allowed the Commonwealth to present the testimony of the troopers, who detailed their interaction with Appellant as described above.  *See* N.T. Suppression Hearing, 3/18/21, at 4.  The Commonwealth also submitted the MVR recordings which captured the entire event.  Appellant testified in contrast to the troopers, claiming that he was forced to pull over the first time because the officers were travelling at a high rate of speed and had nearly collided with his rear bumper.  *Id*. at 34-35.  While Appellant conceded that the police never employed their lights or sirens to initiate a stop, he contended that his second roadway exit was, again, due to the police "forc[ing] me off the road because they were driving too fast."  *Id*. at 41.  At the conclusion of the hearing, the suppression court took the matter under advisement so that it could review the MVR recordings and the parties could provide memoranda of law supporting their positions.

After receiving post-hearing briefs from Appellant and the Commonwealth, the suppression court issued an order denying the motion and authored an opinion in which it rendered the necessary findings of fact and conclusions of law.  Specifically, the suppression court credited the troopers' testimony, while rejecting Appellant's claims that the officers initiated a *de facto* traffic stop by forcing him off the road.  The suppression court reasoned that Appellant's testimony was not corroborated by the MVR

recordings, which demonstrated that the officers never came within two car lengths of Appellant's vehicle and had not attempted to initiate a traffic stop of Appellant. *See* Suppression Court Opinion, 3/30/21, at 4. Since the troopers did not activate emergency lights to stop the vehicle, position their vehicle in a manner that blocked Appellant's exit, brandish weapons, display a show of force, or make any threats or commands, the court concluded that the troopers' initial interaction with Appellant was a mere encounter which did not implicate any federal or state constitutional consequences. *Id*. at 5-6.

Relying on the testimony from the suppression hearing, Appellant proceeded to a stipulated non-jury trial before a different judge. Appellant sought dismissal of both DUI charges due to his possession of a valid prescription for a medical marijuana card. *See* N.T. Non-Jury Trial, 4/26/21, at 2. The court denied the motion, explaining that having a medical marijuana card is not a valid defense to metabolite DUI since the subsections charged prohibited operating a vehicle with any amount of a schedule I controlled substance in the driver's blood and marijuana was listed as a schedule I controlled substance. *Id*. at 3. Afterwards, the court found Appellant guilty of both DUI charges.

On February 26, 2021, Appellant proceeded to sentencing. The trial court sentenced Appellant for DUI of a schedule I controlled substance to twenty-four months of probation with one hundred eight days of restrictive DUI conditions. The court also ordered Appellant to pay a $1,500 mandatory fine and court costs. Finally, Appellant received a mandatory license

suspension of sixty days. The DUI charge pertaining to the marijuana metabolites merged for sentencing purposes. Appellant did not pursue post-sentence motions. Instead, this timely appeal followed. Both Appellant and the trial court complied with the mandates of Pa.R.A.P. 1925.

Appellant raises the following issues for our review:

1. Whether the [suppression] court erred in its order of March 30, 2021 denying Appellant's pretrial motion to suppress evidence due to lack of reasonable suspicion to effectuate a stop of Appellant's vehicle?

2. Whether the evidence was insufficient to support a conviction under 75 [Pa.C.S.] § 3802 §§ D1 DUI: Controlled Substance – Schedule I when Appellant is a lawful user of medical marijuana, no marijuana was found on Appellant's person or vehicle and there was no evidence presented at trial that Appellant was impaired?

Appellant's brief at 4 (cleaned up).

In his first claim, Appellant argues that the court erred when it denied his suppression motion due to a lack of reasonable suspicion to effectuate a stop of his vehicle. *See* Appellant's brief at 7. Preliminarily, we note that,

[a]n appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the

suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Commonwealth v. Smith*, 164 A.3d 1255, 1257 (Pa.Super. 2017) (cleaned up).

Both the United States and Pennsylvania Constitutions provide coterminous protections against "unreasonable searches and seizures." *See Interest of T.W.*, 261 A.3d 409, 418 (Pa. 2021). The law recognizes three distinct levels of interaction between police officers and citizens: (1) a mere encounter, (2) an investigative detention, and (3) a custodial detention. *See Commonwealth v. Mackey*, 177 A.3d 221, 227 (Pa.Super. 2017). Our Supreme Court has reiterated the requirements that distinguish the classifications of contacts between the police and the citizenry as follows:

> The first is a mere encounter, sometimes referred to as a consensual encounter, which does not require the officer to have any suspicion that the citizen is or has been engaged in criminal activity. This interaction also does not compel the citizen to stop or respond to the officer. A mere encounter does not constitute a seizure, as the citizen is free to choose whether to engage with the officer and comply with any requests made or, conversely, to ignore the officer and continue on his or her way. The second type of interaction, an investigative detention, is a temporary detention of a citizen. This interaction constitutes a seizure of a person, and to be constitutionally valid police must have a reasonable suspicion that criminal activity is afoot. The third, a custodial detention, is the functional equivalent of an arrest and must be supported by probable cause. A custodial detention also constitutes a seizure.
>
> No bright lines separate these types of [interactions], but the United States Supreme Court has established an objective test by which courts may ascertain whether a seizure has occurred to

- 8 -

elevate the interaction beyond a mere encounter. The test, often referred to as the "free to leave test," requires the court to determine whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. [W]henever a police officer accosts an individual and restrains his freedom to walk away, [the officer] has "seized" that person.

*Commonwealth v. Adams*, 205 A.3d 1195, 1199-1200 (Pa. 2019). Whether a seizure has occurred is a question of law involving a plenary scope of review. *See Commonwealth v. Au*, 42 A.3d 1002, 1006 (Pa. 2012).

When initially evaluating the level of interaction between law enforcement and a citizen to determine whether, and at what point, a seizure may have occurred, "courts conduct an objective examination of the totality of the surrounding circumstances." *Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014). Relevant factors of that analysis include, but are not limited to: "the number of officers present during the interaction; whether the officer informs the citizen they are suspected of criminal activity; the officer's demeanor and tone of voice; the location and timing of the interaction; the visible presence of weapons on the officer; and the questions asked." *Commonwealth v. Luczki*, 212 A.3d 530, 543 (Pa.Super. 2019) (internal quotation marks omitted). Importantly, a seizure does not occur when officers "merely approach a person in public and question the individual or request to see identification" so long as the officer does not imply that the citizen is required to comply with their request. *See Lyles*, *supra* at 303.

- 9 -

Appellant contends that the troopers had no legal authority to approach his parked vehicle and ask for identification because there was no evidence that he needed assistance or had violated any traffic laws. *See* Appellant's brief at 9. In his view, the troopers forced a traffic stop when they twice approached his vehicle at a high rate of speed. Thus, the troopers needed reasonable suspicion that criminal activity was afoot before approaching the vehicle and requesting his identification. *Id*. at 9-10. We disagree.

We find our Supreme Court's decision in *Au*, *supra* instructive. In *Au*, a police officer was conducting a routine patrol in the early morning hours when he observed a vehicle parked at a closed business establishment. *Id*. at 1003. Finding this occurrence unusual, the officer pulled into the parking lot and positioned his vehicle at an angle relative to the parked vehicle to illuminate the passenger side without blocking the vehicle's ability to exit or activating his emergency lights. *Id*. The officer approached on foot with a flashlight, observed six occupants, and watched the defendant roll down his window. The officer asked the defendant "what's going on[?]" and the defendant responded we are just "hanging out." *Id*. After asking whether the occupants were eighteen years of age and receiving a negative response, the officer asked the defendant for his identification. The defendant opened the glove compartment, revealing two baggies of marijuana. There was no evidence of any criminal activity or a violation of the Motor Vehicle Code prior

to the defendant opening the glove compartment. A subsequent search of the vehicle uncovered additional illegal drugs.

Following the defendant's arrest, he sought to suppress the drug evidence, alleging that the interaction amounted to an investigative detention unsupported by reasonable suspicion. The trial court suppressed the evidence and an *en banc* panel of this Court affirmed that ruling. ***See Commonwealth v. Au***, 986 A.2d 864 (Pa.Super. 2009) (*en banc*). However, our Supreme Court reversed, holding that the police officer's interaction with the defendant amounted to a mere encounter, explaining as follows:

> In the present case, the arresting officer's unrebutted testimony indicates that he did not: activate the emergency lights on his vehicle[;] position his vehicle so as to block the car that [the defendant] was seated in from exiting the parking lot[;] brandish his weapon; make intimidating movement or overwhelming show of force; make a threat or a command; or speak in an authoritative tone. . . . In terms of the use of the arresting officer's headlights and flashlight this was in furtherance of the officer's safety, and we conclude it was within the ambit of acceptable, non-escalatory factors. . . .
>
> Pursuant to governing Fourth Amendment law, we hold that the arresting officer's request for identification did not transform his encounter with [the defendant] into an unconstitutional investigatory detention.

*Id*. at 1008-09.

Our own review of the MVR recordings reveals the similarities between ***Au*** and this case. Herein, the troopers did not travel at an extraordinary speed, tailgate Appellant, activate their emergency lights and sirens, or make any other show of force that would convey to a reasonable person in

Appellant's position that he needed to exit the roadway. Instead, the troopers maintained a safe distance during the short time that they were behind Appellant's vehicle on a public roadway. *See also* Suppression Court Opinion, 3/30/21, at 2-4. Since Appellant exited and parked in the municipal building lot of his own volition, his decision to do so did not create a traffic stop that required reasonable suspicion. Critically, as in *Au*, the troopers parked their vehicle perpendicular to Appellant's vehicle without blocking his ability to exit the lot and approached to ask questions targeting Appellant's well-being and identification. Although Appellant repeatedly accused the troopers of harassing him, he acknowledged that he pulled over without being stopped and provided his license without evincing a desire to terminate the interaction.

Given the totality of the circumstances in this case, Appellant's initial interaction with the troopers constituted a mere encounter. We cannot conclude that a reasonable person would have thought they were being restrained when a police vehicle drove behind them on a roadway or when two officers approached that vehicle, which was parked at a closed establishment, to inquire about the operator's well-being. Thus, consistent with *Au*, Appellant was not seized within the meaning of the Fourth Amendment to the United States Constitution or Article 1, Section 8 of the Pennsylvania Constitution when he pulled into the municipal parking lot or

during the initial interaction that occurred there. Therefore, Appellant is not entitled to any relief on his first issue.[1]

In his second claim, Appellant contends that the Commonwealth presented insufficient evidence to establish that he had a Schedule I substance or the metabolite of Schedule I substance in his blood, because "medical marijuana" is not a Schedule I controlled substance in Pennsylvania. ***See*** Appellant's brief at 10-14.

Our scope and standard of review when considering challenges to the sufficiency of the evidence are well settled:

_____

[1] To the extent Appellant's argument that he "did not engage in any conduct that would suggest to the police that he needed assistance" can be construed as an assertion that the community caretaking exception to the warrant requirement does not apply, we note that this claim is waived due to Appellant's failure to raise it before the suppression court. ***See*** Appellant's brief at 9; ***see also*** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."). However, even if properly preserved, Appellant would not be entitled to relief. The community caretaking exception applies only where a seizure has occurred, providing police with the necessary reasonable suspicion to justify an investigative detention. ***See, e.g. Commonwealth v. Schneider***, 239 A.3d 161, 170-71 (Pa.Super. 2020) (finding the community caretaking exception did not allow the police to enter a home without a warrant to further investigate whether assistance was required where nothing in the defendant's demeanor, statements, outward appearance, or condition indicated that he needed police assistance); ***see also, e.g. Commonwealth v. Livingstone***, 174 A.3d 609, 637 (Pa. 2017) (finding that the trooper's warrantless seizure of the defendant to ascertain if she needed help was not permitted under the community caretaking doctrine because the facts did not establish that the defendant actually needed assistance). Herein, the only portion of the interaction that Appellant challenged amounted to a mere encounter. Thus, the troopers did not need to possess reasonable suspicion and the community caretaking exception is inapplicable.

Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

*Commonwealth v. Williams*, 176 A.3d 298, 305–06 (Pa.Super. 2017) (citations and quotation marks omitted).

The Medical Marijuana Act ("MMA") permits qualifying individuals to lawfully consume marijuana. *See* 35 P.S. §§ 10231.101–10231.2110. Notwithstanding this, the list of Schedule I controlled substances set forth in the Controlled Substances Act ("CSA") currently includes marijuana. *See* 35 P.S. § 780-104(1)(iv). Critically, the applicable portion of the DUI statute states:

**(d) Controlled Substances**. – An individual may not drive, operate or be in actual physical control of the movement of a vehicle under any of the following circumstances:

(1) there is in the individual's blood any amount of a:

(i) Schedule I controlled substance, as defined in the act of April 14, 1972 (P.L. 233, No. 64), known as the [CSA].

. . .

- 14 -

> (iii) metabolite of a substance under subparagraph (i) or (ii).

75 Pa.C.S. § 3802(d)(1)(i), (iii). Thus, § 3802(d)(1) does not require that a driver be impaired; rather, it prohibits the operation of a motor vehicle by **any** driver who has **any** amount of a Schedule I controlled substance in his blood. *See Commonwealth v. Etchison*, 916 A.2d 1169, 1174 (Pa.Super. 2007); *see also* 75 Pa.C.S. § 3810 (stating that "[t]he fact that a person charged with violating this chapter is or has been legally entitled to use alcohol or controlled substances is not a defense to a charge of violating his chapter."). With regard to the significance of Appellant's medical marijuana card, during the pendency of this appeal, this Court found that the Schedule I designation for marijuana pertinent to § 3802(d)(1) includes medical marijuana. *See Commonwealth v. Stone*, 273 A.3d 1163, 1174 (Pa.Super. 2022) (*en banc*); *see also Commonwealth v. Dabney*, 274 A.3d 1283, 1291 (Pa.Super. 2022) ("[M]edical marijuana remains a Schedule I controlled substance for purposes of Section 3802(d)(1).") In so holding, we noted that while "[t]he [MMA] anticipates the removal of marijuana from Schedule I. . ., the General Assembly has not enacted legislation amending the MMA, CSA, or the DUI statutes to remove marijuana from its Schedule I designation under state law." *Stone*, *supra* at 1172. Since the issuance of *Stone*, neither 75 Pa.C.S. § 3802(d)(1) nor 35 P.S. § 780-104(1)(iv) have been amended to distinguish between medical and non-medical marijuana. Accordingly, pursuant to our

holding in **Stone**, § 3802(d)(1)(i) specifically prohibits driving with any amount of medical or non-medical marijuana in the driver's blood.

Herein, it is undisputed that Appellant was driving a motor vehicle at a time when detectable amounts of marijuana and its metabolites were discovered in his blood stream. Accordingly, the Commonwealth presented sufficient evidence to support Appellant's DUI conviction for imbibing a Schedule I controlled substance and its metabolites pursuant to 75 Pa.C.S. § 3802(d)(1)(i) and (iii).

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/21/2023