J-S44038-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JONMIR CROMWELL | : | |
| | : | |
| Appellant | : | No. 3118 EDA 2023 |

Appeal from the Judgment of Sentence Entered November 2, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0002889-2023

BEFORE:  NICHOLS, J., MURRAY, J., and LANE, J.

MEMORANDUM BY LANE, J.:                    **FILED MARCH 24, 2025**

Jonmir Cromwell ("Cromwell") appeals from the judgment of sentence imposed following his convictions for two counts of persons not to possess a firearm, and one count each of firearms not to be carried without a license, carrying firearms on public streets or public property in Philadelphia, and possession of a controlled substance.[1]  We affirm.

The relevant facts of this case, developed during Cromwell's pretrial suppression hearing, are as follows.

> On March 31, 2023, around 10:30 pm, [Philadelphia] Police Officer Hugh Banister (hereinafter "Officer Banister") was in full uniform on Woodland Avenue which he described as a heavily commercial and high crime area.  [Officer Bannister had previously conducted narcotics, firearms, and homicide arrests within half a block of that area, as well as arrests for dozens of violent crimes within a five-block radius.]  He was walking with his

_____

[1] ***See*** 18 Pa.C.S.A. §§ 6105(a)(1), 6106(a)(1), 6108; 35 P.S. § 780-113(a)(16).

partner Officer [Morrin[2]] to the 12th Police District [station] located at 6448 Woodland [Avenue,] which is directly across the street from 6443 Woodland [Avenue], a small Chinese carry out [restaurant] with a large glass front window.

While passing the Chinese restaurant, Officer Banister saw through the window [four to six] males . . . with "confrontational body language . . . hands near their waistbands, . . . trying to fight" and "one male in particular leaned towards [Cromwell . . . ." Officer Banister] recognized two of the males from the neighborhood and entered the store alone to deescalate the situation. He asked of one of them: "Is everything okay[,] you guys aren't trying to fight, are you?" In response the males left the store, but [Cromwell] remained inside with [a] female. [Cromwell] was standing with both hands inside the pockets of his black polyester track style windbreaker jacket. Officer Ban[]ister saw a "bulge that was protruding out" that looked "like it could have been the muzzle of a firearm" based on the size and shape "where the slide would stick out . . . and slightly squarish [*sic*]."

[Officer Banister] asked [Cromwell twice] to remove his hands from his pockets. . . .

Trial Court Opinion, 3/19/24, at 2-3 (citations and unnecessary capitalization omitted).

At the suppression hearing, Officer Banister testified that when he asked Cromwell to remove both hands from his pockets, Cromwell removed only his right hand, which was not visible to the officer, but kept his left hand, which was closer to the officer, in his pocket. *See* N.T. (Waiver Trial), 9/5/23, at 18. When Officer Banister asked Cromwell again to take his left hand out of his pocket, he did so quickly, which caused the officer to fear he was

_____

[2] The notes of testimony do not indicate Officer Morrin's first name.

brandishing a firearm. ***See*** N.T., 9/5/23, at 18, 26. Officer Banister then activated his body-worn camera. ***See id***. at 18, 25.

The trial court summarized the ensuing events:

Officer Ban[]ister asked [Cromwell] if he had a permit to carry and [Cromwell] replied "No." At this point, Officer Ban[]ister ordered [Cromwell] to place both hands on the wall, and other officers came inside the store to assist. [Cromwell] was detained, and handguns were retrieved from both jacket pockets. From the right jacket pocket: a black and gray [nine] millimeter handgun with no serial number [loaded with] eleven rounds. From the left jacket pocket: a black Smith & Wesson semiautomatic handgun with flashlight laser [loaded with sixteen] rounds [*sic*]. Also recovered from [Cromwell's] pants pockets were [six forty-five] caliber rounds and narcotics. [Cromwell] was . . . arrested.

Trial Court Opinion, 3/19/24, at 3.

The Commonwealth charged Cromwell with firearms and drug offenses. Cromwell filed a motion to suppress all physical evidence, and the trial court conducted an evidentiary hearing on September 5, 2023. The sole witness presented was Officer Banister, who testified to the above. The Commonwealth introduced video footage from the officer's body-warn camera during his testimony. Cromwell offered no evidence.

At the conclusion of the evidence, Cromwell argued that the police conducted an illegal search and seizure of his person without reasonable suspicion or probable cause, which led to the discovery of two firearms and narcotics in his pockets. ***See*** id. at 5-6. Cromwell also maintained that the video, from Officer Banister's body-worn camera, contradicted the officer's testimony that he was able to see a gun in Cromwell's pocket. ***See id***. at 32.

The Commonwealth asserted that under the totality of the circumstances, the interaction between Cromwell and Officer Banister was a mere encounter, not a seizure. *See id*. at 41-42.

At the hearing's conclusion, the trial court issued its factual and legal findings on the record and denied Cromwell's motion to suppress. *See* N.T., 9/5/23, at 43-48. The trial court referenced Officer Banister's testimony that after his initial encounter to deescalate the situation between Cromwell and the men in the restaurant, everyone left, except Cromwell, who remained standing there with his hands in his pockets. *See id*. at 45-46. We note the trial court's sole reference to the body worn camera-video was a mention that the video showed two women in the restaurant. *See id*. 45. The trial court specifically credited Officer Banister's testimony that he observed a gun protruding from Cromwell's pocket:

> [Officer Banister] asked [Cromwell] to remove his hands from his pockets, and pursuant to Pennsylvania case law, that is appropriate. He described [Cromwell's] attire as a polyester zip front track jacket with a bulge. The officer testified that to him the bulge looked like a firearm, but [Cromwell] had both hands in those pockets and the officer testified as to his concern about that, so he requested removal of his hands.
>
> [Officer Banister] indicated [that] when [Cromwell] removed his hands from one of the pockets, ***the officer immediately saw a firearm***, and he asked [Cromwell] if he had a license to carry[,] to which [Cromwell] replied, no, and the officer immediately had him turn against the wall for detention at that point. [Cromwell] was handcuffed and several officers came in and participated in the detention and frisk[]. Subsequently the gun was removed and other items of contraband.

N.T., 9/5/23, at 46 (emphasis added).

- 4 -

The trial court determined that the initial interaction between Cromwell and Officer Banister was a mere encounter that elevated to a detention:

> The issue in this matter is the application of **Commonwealth v. Hicks**, [208 A.3d 916 (Pa. 2019),] and it does not apply to these circumstances. Our Supreme Court has clarified there is no justification for the notion that a police officer may infer criminal activity merely from an individual's possession of a concealed firearm in public.
>
> However, no such inference[,] such as the alleged possession of a handgun[,] forms the basis of [Officer Banister's] investigation of [Cromwell] as their interaction was a mere encounter initiated by the request of removal from his hands from his pockets for [the] officer's safety.
>
> The initial encounter cannot be construed as a detention based upon the case law for the mere removal of hands. Once the actual firearm was seen, the officer had a right to inquire as to the licensing status of a firearm that is not in one's home or business but on the streets of Philadelphia.
>
> [Cromwell] explained or replied that he was not licensed, and at that point he was an unlicensed firearm holder, and there was a basis for the stop or dete[n]tion.

N.T., 9/5/23, at 47-48.

In ruling from the bench, the trial court held both "[t]he detention and search were warranted." *Id*. at 48. The matter proceeded immediately to a non-jury trial, where the Commonwealth moved to admit the non-hearsay testimony from the suppression hearing. Cromwell stipulated to, *inter alia*, having a prior robbery conviction, disqualifying him from possessing a gun under 18 Pa.C.S.A. § 6105. Cromwell did not present any evidence or testify. That same day, the trial court found him guilty of all charges: two counts each of persons not to possess a firearm, and one count each of firearms not to be

carried without a license, carrying firearms on public streets or public property in Philadelphia, and possession of a controlled substance.

On November 2, 2023, the trial court imposed a sentence of four to eight years' imprisonment on the first count of persons not to possess a firearm, and a consecutive sentence of three to six years on the second count. The court imposed no further penalty on the remaining charges. The aggregate sentence was thus seven to fourteen years' incarceration. Cromwell did not file a post-sentence motion.

Cromwell filed a timely notice of appeal. Both Cromwell and the trial court complied with Pa.R.A.P. 1925.

Cromwell raises the following issues for our review:

1. Should not the [trial] court have granted the motion to suppress evidence?

    A. Whether the [trial] court erroneously denied a suppression motion, ruling that it was a mere encounter, where [Cromwell] would not have objectively felt free to ignore the officer and to keep his hands in his jacket pockets?

    B. Where the officer's testimony that he saw a firearm in the [Cromwell's] pocket was contradicted by a video of the incident, was not the court's reliance on this testimony and a finding of probable cause to search incorrect?

2. Whether the [trial] court imposed an illegal sentence by subjecting [Cromwell] to two consecutive sentences for the same offense for a single criminal act?

Cromwell's Brief at 2.

Since Cromwell's first two claims, challenging the denial of his suppression motion, are interrelated, we will consider them together. In our

review of a trial court's order denying a pretrial motion to suppress, the following serves as our guidance:

> [O]ur standard of review . . . is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

*Commonwealth v. Yandamuri*, 159 A.3d 503, 516 (Pa. 2017) (citations and footnote omitted).

While our standard of review requires us to consider the evidence to the extent it "remains uncontradicted when read in the context of the record as a whole[,]" *Commonwealth v. Cartagena*, 63 A.3d 294, 298 (Pa. Super. 2013) (citation omitted), this Court is not obligated to "accept the Commonwealth's interpretation of the evidence it presented — particularly when the incident and surrounding circumstances were captured on video." *Commonwealth v. Sinkiewicz*, 293 A.3d 681, 690 (Pa. Super. 2023). Moreover, we note:

> It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony. The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing. . . .

*Commonwealth v. Bozeman*, 205 A.3d 1264, 1270 (Pa. Super. 2019) (citation and quotation marks omitted).

The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution prohibit unreasonable searches and seizures. *See Commonwealth v. Thompson*, 289 A.3d 1104, 1107 (Pa. Super. 2023). Pennsylvania courts recognize "three levels of interaction between the police and citizens: (1) a mere encounter, (2) an investigative detention, and (3) a custodial detention." *Commonwealth v. Spence*, 290 A.3d 301, 314 (Pa. Super. 2023) (citation omitted).

> The first, a "mere encounter," does not require any level of suspicion or carry any official compulsion to stop or respond. The second, an "investigative detention," permits the temporary detention of an individual if supported by reasonable suspicion. The third is an arrest or custodial detention, which must be supported by probable cause.

*Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014) (citations omitted). The Pennsylvania Supreme Court considers only the latter two categories as seizures. *See Commonwealth v. Strickler*, 757 A.2d 884, 889 (Pa. 2000).

> To determine whether a seizure has occurred, we employ

> an objective test entailing a determination of whether, in view of all surrounding circumstances, a reasonable person would have believed that he was free to leave. In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained. In making this determination, courts must apply the totality-of-the-circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred.

*Id*. at 889-90 (citation and footnotes omitted). Relevant, but non-exhaustive factors, include: "the demeanor of the police officer, the location of the confrontation, the manner of expression used by the officer in addressing the citizen, and the content of the interrogatories or statements." *Id*. at 898 (citation omitted). Moreover, "[a]lthough cases involving similar or comparable seizure determinations may serve as guideposts, a suppression court must independently employ the totality-of the-circumstances test in determining whether a seizure occurred." *Lyles*, 97 A.3d at 305.

A mere encounter— because it is not a seizure — does not require any level of suspicion or other legal justification. *See id*. at 302. Therefore, "police may approach anyone in a public place to talk to him, without any level of suspicion, but the citizen 'has a right to ignore the police and go about his business.'" *In re. D.M.*, 781 A.2d 1161, 1164–1165 (Pa. 2001) (citations omitted).

It bears emphasis that "the [Pennsylvania Supreme] Court and the United States Supreme Court have repeatedly held a seizure does not occur where the officers merely approach a person in public and question the individual or request to see identification." *Lyles*, 97 A.3d at 303; *see also Commonwealth v. Au*, 42 A.3d 1002, 1009 (Pa. 2012) (holding that in assessing the totality of the circumstances, "the arresting officer's request for identification [and use of his headlights to illuminate the passenger side of the car in furtherance of his safety] did not transform his encounter with [the defendant] into an unconstitutional investigatory detention[]"); *compare*

*Commonwealth v. Livingstone*, 174 A.3d 609 (Pa. 2017) (stating "we simply cannot pretend that a reasonable person, innocent of any crime, would not interpret [under these circumstances from a police officer's actions] that he or she is not free to leave"). However, an interaction could elevate from a mere encounter to a seizure "when the officer, by means of physical force, or by displaying or asserting authority, restrains the liberty of the citizen . . .." *Commonwealth v. Boswell*, 721 A.2d 336, 340 (Pa. 1998).

Furthermore:

[I]f during a mere encounter, an individual on his own accord, puts his hands in his pocket, thereby creating a potential danger to the safety of a police officer, the officer may justifiably reach for his side arm and order the individual to stop and take his hand out of his pocket. Such reaction by a police officer does not elevate the mere encounter into an investigative detention because the officer's reaction was necessitated by the individual's conduct.

*Commonwealth v. Coleman*, 19 A.3d 1111, 1117 (Pa. Super. 2011) (citations and quotation marks omitted); *see also Commonwealth v. Thomas*, 179 A.3d 77, 82-83 (Pa. Super. 2018) (applying *Coleman* and holding that the officer's asking the defendant to take his hands out of his pockets did not turn the mere encounter into a seizure); *Commonwealth v. Hemingway*, 192 A.3d 126, 135 (Pa. Super. 2018) (acknowledging our precedent regarding police requests to defendants to remove their hands from their pockets, but determining, following a fact-specific inquiry, that in response to a noise complaint, the defendant's actions of talking to a woman while keeping his hands in his pockets in a high-crime area did not establish

reasonable suspicion sufficient for a detention under the circumstances, and that the order to take his hands out of his pockets was an investigative detention).

"It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." *Harris v. U.S.*, 390 U.S. 234, 236 (1968). Therefore, if an officer observes contraband in plain view, from a lawful vantage point, during an investigative detention supported by reasonable suspicion, the officer may lawfully seize such contraband. *See id*. The plain view doctrine permits the seizure of an object in the dark that the officer could see only once illuminated by flashlight. *See Commonwealth v. Burton*, 436 A.2d 1010, 1013 (Pa. Super. 1981).

Cromwell first argues that the trial court erroneously denied his motion to suppress evidence of the two firearms and narcotics. Cromwell claims that when Officer Banister ordered him to remove his hands from his pockets, the interaction was not a mere encounter but instead was an investigative detention. He argues: "There indisputably was no reasonable suspicion at the time because there was no report of criminal activity, [Cromwell] took no action that was furtive or raised suspicion of criminal activity, and the officer had no other information about [Cromwell] or any other criminal activity." Cromwell's Brief at 8. Cromwell asserts that the trial court failed to properly evaluate the totality of the circumstances, and he maintains that based on the officer's words, "loud[] and demanding" tone of voice, and conduct as shown

in the body-worn camera video, Cromwell did not feel free to ignore the officer.[3] *Id*. at 9, 16.

Finally, Cromwell contends that the body-worn camera video contradicted Officer Banister's testimony that he saw a gun poking out of his left pocket when he took his left hand out. Cromwell claims that the trial court erred in determining that the police had probable cause to conduct a search because of the officer's contradictory testimony.

The trial court rejected Cromwell's suppression claim. It first concluded that, "from the totality of circumstances in the instant matter," Officer Banister's initial interaction with Cromwell, asking him to remove his hands from his pockets, was a mere encounter. Trial Court Opinion, 3/19/24, at 6-8. The trial court considered decisional precedent that: (1) "[a] request from an officer to 'show hands' is deemed by our Courts [to be] an interaction of mere encounter[]"; and (2) "the fact that an officer asks an individual to take his hands out of his pockets does not turn an encounter into a seizure." *Id*. at 6-7 (citations omitted).

The trial court further held that when Officer Banister asked Cromwell, after seeing the gun in his pocket, whether he had a license to carry a gun,

_____

[3] On appeal, Cromwell argues that Officer Banister shined a flashlight on him, contributing to an unlawful seizure. *See* Cromwell's Brief at 9, 16. However, at the suppression hearing, Cromwell did not make any argument concerning a flashlight, and thus he has waived this claim for appeal. *See* Pa.R.A.P. 302(a) (providing that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal"); *see also* Pa.R.A.P. 1925(b)(4)(vii) (stating that issues not included in the Rule 1925(b) statement are waived).

the interaction continued to be a mere encounter. In support, the trial court reasoned that "a seizure does not occur where officers merely approach a person in public and question the individual or request to see identification." *Id*. at 7 (*citing*, *inter alia*, **Lyles**, 97 A.3d at 302).

The trial court then determined, however, that when Officer Banister ordered Cromwell to place his hands on the wall, the interaction escalated to an investigative detention. **See** N.T., 9/5/23, at 46. The court found this detention was supported by the requisite reasonable suspicion that criminal activity was afoot — based on Cromwell's response that he did not have a license to carry a gun. **See id**. at 3, 8.

Based upon our review, we conclude the record, including the relevant body-worn camera footage of the incident, supports the trial court's factual findings and legal conclusions. **See Yandamuri**, 159 A.3d at 516. First, we agree that under the totality of the circumstances, Officer Banister's initial interaction with Cromwell — asking him to remove his hands from his pockets — was a mere encounter. Officer Banister initially entered the restaurant to deescalate a confrontation between a group of four to six men, who appeared as if they were going to fight. The officer did not use physical force, nor display or assert authority. **See Boswell**, 721 A.2d at 340. We note, as did the trial court, that most of the group left on their own accord immediately after the officer entered. **See D.M.**, 781 A.2d at 1164–65; **see also** N.T., 9/5/23, at 45. Officer Banister did not direct Cromwell to stay, and instead

- 13 -

Cromwell chose to remain in the restaurant, indicating that he was not detained. *See id*.

Officer Banister saw Cromwell had both hands in the thin pockets of his jacket and observed a bulge in his left pocket resembling the outline of a firearm. *See* N.T., 9/5/23, at 15-16. Officer Banister thus asked Cromwell to remove his hands from his pockets. *See id*. at 18. Cromwell responded by only taking his right hand out of his pocket, not visible to Officer Banister, which concerned the officer for his safety. *See id*. at 16-18. Officer Banister again directed Cromwell to remove his hands from his pockets, and when Cromwell complied, his left pocket opened, and in plain view the officer immediately saw a handgun inside. *See id*. at 18.

At this point, there was reason for Officer Banister to be concerned for his safety. Cromwell had been among a group that appeared to be on the verge of a physical confrontation, at close quarters in a high crime area. Furthermore, Cromwell was reluctant to take his hand out of the pocket that had a bulge that appeared to be a firearm. *See Thomas*, 179 A.3d at 83; *see also Coleman*, 19 A.3d at 1117. Officer Banister: did not brandish his weapon, make intimidating movements or overwhelming show of force, or make a threat or a command; but instead asked Cromwell to remove his hands from his pockets for the officer's safety. *See Boswell*, 721 A.2d 336. The trial court was entitled to credit the officer's testimony at the suppression hearing that he saw a gun sticking out of Cromwell's pocket. *See Bozeman*, 205 A.3d at 1270. This Court has determined that a request from an officer

to "show hands" is an interaction of mere encounter. *See Thomas*, 179 A.3d at 83. Furthermore, the fact that an officer asked an individual to take his hands out of his pockets, due to officer safety, does not escalate a mere encounter into a seizure. *See id*. Under the totality of the circumstances, we agree with the trial court that at this time, the interaction remained a mere encounter and was not an investigative detention. *See Coleman*, 19 A.3d at 1117.

Then, upon seeing an actual firearm, Officer Banister asked Cromwell whether he had a permit to carry, and Cromwell replied that he did not. At that point, Officer Banister told Cromwell to put his hands on the wall, detained him, and recovered two firearms and narcotics from his pockets. We agree with the trial court that, under the totality of the circumstances, at this point the interaction escalated to an investigative detention. We further agree Officer Banister possessed the requisite reasonable suspicion to detain Cromwell — Cromwell admitted that he did not have a license to carry the gun, which was in plain view.

Furthermore, we determine no relief is due on Cromwell's claim that the body-worn camera video contradicted, or disproved, Officer Banister's testimony that he observed a gun in his left pocket. We discern no error in the suppression court's reliance on Officer Banister's testimony at the suppression hearing that he observed a gun in Cromwell's pocket. The trial court's opinion did not explicitly mention Officer Banister's body-worn camera video. The trial court's sole reference at the suppression hearing was a remark

- 15 -

that the video showed two women stayed in the store after part of the initial group left. *See* N.T., 9/5/23, at 45. Nevertheless, in reaching its decision, the trial court's conclusions indicate that it accepted Officer Banister's testimony that after Cromwell removed his hands from his pockets, the officer immediately saw a gun sticking out of Cromwell's pocket. *See id*. at 46; *see also* Trial Court Opinion, 3/19/24, at 7 (stating, "Upon seeing an actual firearm Officer Ban[]ister inquired of [Cromwell] if he had a permit to carry").

We reiterate that the trial court, as the factfinder, was free to "pass on the credibility of witnesses and the weight to be given their testimony" and "to believe all, some or none of the evidence presented at the suppression hearing." *Bozeman*, 205 A.3d at 1270. Accordingly, Cromwell's first two issues are without merit.

In his final issue, Cromwell challenges the legality of his sentence. He argues that his consecutive sentences on two separate counts of persons not to possess a firearm violated the double jeopardy and merger of sentence clauses.[4]

> "[A]n appeal grounded in double jeopardy raises a question of constitutional law. This [C]ourt's scope of review in making a determination on a question of law is, as always, plenary. As with all questions of law, the appellate standard of review is *de novo*. To the extent that the factual findings of the trial court impact its

_____

[4] Although Cromwell raises this issue for the first time on appeal, we determine he has not waived it for our review. *See Commonwealth v. Hill*, 238 A.3d 399, 409 (Pa. 2020) (determining that illegal sentence and double jeopardy claims are non-waivable, and a defendant can raise them for the first time on appeal).

double jeopardy ruling, we apply a more deferential standard of review to those findings[.]"

***Commonwealth. v. Kearns***, 70 A.3d 881, 884 (Pa. Super. 2013).

"The Double Jeopardy Clause, applicable to the States through the Fourteenth Amendment, provides that no person shall 'be subject for the same offense to be twice put in jeopardy of life or limb.'" ***Commonwealth v. Jackson***, 10 A.3d 341, 344-45 (Pa. Super. 2010). In determining whether a there has been a violation of a defendant's protection against multiple punishments for the same offense, we apply the test set forth in ***Blockburger v. United States***, 284 U.S. 299 (1932). Under the ***Blockburger*** test,

> where the two offenses for which the defendant is punished or tried cannot survive the "same-elements" test, the double jeopardy bar applies. The same-elements test . . . inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution.

***Jackson***, 10 A.3d at 345 (citation omitted). Applying the ***Blockburger*** test "requires a comparison of the elements of the offenses to determine whether 'each [offense] requires proof of a fact which the other does not.'" ***Id***. (citation omitted). Mere "overlap in proof between two prosecutions does not establish a double jeopardy violation." ***Id***.

Section 9765 of the Pennsylvania Sentencing Code, which governs merger, provides:

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S.A. § 9765.

Section 6105 of our Crimes Code defines the offense of persons not to possess firearms, in relevant part, as follows:

A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.

18 Pa.C.S.A. § 6105(a)(1).

This Court has concluded that if a defendant, who is prohibited from possessing a firearm simultaneously possesses two handguns, they may be convicted and separately sentenced on two counts of persons not to possess a firearm. **See Commonwealth v. Jones**, 2 A.3d 650, 654 (Pa. Super. 2010). In **Jones**, we held that "[t]he Legislature's use of the indefinite article 'a' in the definition of the proscribed conduct makes it clear a person who is prohibited from possessing a firearm under section 6105 violates 6105 **for each firearm possessed**." **Id**. at 654 (emphasis added); **see also Commonwealth v. Ratliff**, 328 A.3d 1042, 1055 (Pa. Super. 2024) (emphasis added) (applying **Jones** and holding merger did not apply and defendant "was properly convicted and sentenced for each subsequent firearm obtained through a straw purchase").

Cromwell argues that his possession of two guns was "one criminal act" of persons not to possess a firearm, and thus his two counts should have

merged for sentencing purposes. Cromwell's Brief at 21. He also avers the imposition of two separate sentences violated double jeopardy. Cromwell claims that the trial court erred in imposing consecutive sentences, as there is a lack of clear "legislative intent to impose multiple punishments when a person possesses two guns at the same time in his pockets." *Id*. at 25. Cromwell acknowledges this Court's decision in *Jones*, which "rejected the [same] illegal sentence claim [presented] here," and "held that multiple punishments could be imposed under Section 6105 where a single possession involved two firearms." *Id*. at 26-27. Nevertheless, Cromwell avers it was a "clearly erroneous decision" under United States and Pennsylvania Supreme Court precedent, and thus "this Court should not follow *Jones*." *Id*. at 26-28 (footnote omitted).

Upon our review, there is no dispute, and in fact Cromwell stipulated, that he was a previously convicted felon prohibited from possessing firearms. There was also no question that he simultaneously possessed two firearms: a nine-millimeter handgun with no serial number loaded with eleven rounds; and a black Smith & Wesson semiautomatic handgun with flashlight laser loaded with sixteen rounds. The act of possessing each firearm constituted a separate act of possession for purposes of section 6105, each subjecting Cromwell to separate prosecutions and separate sentences. *See* 18 Pa.C.S.A. § 6105(a)(1); *see also Jones*, 2 A.3d at 654. Accordingly, Cromwell's consecutive sentences for two counts of persons not to possess a firearm does

not violate the double jeopardy clause or the merger doctrines. **See Jones**, 2 A.3d at 654; **see also Ratliff**, 328 A.3d at 1055. To the extent Cromwell suggests this panel should overturn or reverse the **Jones** decision, we may not so do. **See Commonwealth v. Reed**, 107 A.3d 137, 143 (Pa. Super. 2014) (stating that Superior Court is bound by existing precedent until such time it is overturned).

Thus, Cromwell's second claim is without merit and the trial court's imposition of his consecutive sentences did not violate the double jeopardy or merger of sentences clauses.

Accordingly, based on all the foregoing, Cromwell is not due any relief. We thus affirm Cromwell's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/24/2025